[S. F. No. 8786. In Bank.—August 30, 1920.]

## MANUEL ESTRADA CABRERA, Respondent, *v.* THANN-HAUSER & COMPANY (a Corporation), Appellant.

[1] BANKS AND BANKING—DRAFTS FOR COLLECTION—PROCEEDS—GENERAL DEPOSIT.—When, in the regular course of business, one person sends to another drafts or bills of exchange for collection or sale and does not specifically direct that the funds realized therefrom are to constitute a special deposit, they become a general deposit, even though the correspondent has knowledge that the proceeds are intended for a particular purpose.

[2] ID.—DRAWING OF BILLS OF EXCHANGE—REMITTANCE OF DRAFTS BY DRAWERS TO DRAWEE FOR COLLECTION—INSTRUCTIONS—SPECIAL FUND NOT CREATED.—Where the drawers of foreign bills of exchange at the time of the drawing of the bills remitted to the drawee certain drafts of third persons with instructions to negotiate a certain amount of them every week and credit, the proceeds of such drafts did not constitute a special deposit for the payment of the bills, notwithstanding it was also stated in the instructions that the drafts were to reimburse the drawee.

[3] NEGOTIABLE INSTRUMENTS—ACTION ON BILLS OF EXCHANGE—EVIDENCE—LETTER OF PAYEE TO DRAWEE.—Where the drawee of bills of exchange advised the payee that acceptance was refused because the drawers were responsible for another account which was overdrawn and asked the payee to use his good offices in adjusting and settling such account, a letter of the payee stating that he could not intervene in the matter, as it seemed entirely foreign to him, was not admissible, in an action by the payee against the drawee, as an admission that the payee had no further rights in the bills.

[4] ID.—COURSE OF DEALINGS BETWEEN DRAWER AND DRAWEE.—In an action by the payee against the drawee of bills of exchange, evidence showing the course of dealings between the drawer and drawee both prior and subsequent to the drawing of the bills is admissible to show that the bills were not to be paid, as contended by the payee, from a special fund, but out of a general fund.

[5] ID.—STATUS OF ACCOUNT BETWEEN DRAWER AND DRAWEE.—In an action by the payee against the drawee of bills of exchange, evidence that at the time the bills were drawn the drawer's account with the drawee was overdrawn was admissible as tending to show

1. What is special, as distinguished from general, deposit in bank, notes, Ann. Cas. 1913E, 45; 16 L. R. A. 516; 39 L. R. A. (N. S.) 847; L. R. A. 1918A, 65.

that certain drafts of third persons sent to the drawee at the time of the drawing of the bills were for the purpose of replenishing the general fund, rather than to create a special fund for the payment of the bills.

[6] Id.—Crediting of Account—Proceeds of Draft Collections.—In such action, a letter written by the drawers to the drawee requesting the booking of the balance of the account, to which the proceeds of the drafts were credited, in the general account was admissible as tending to show that the drawers regarded such account as a general account.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. John Hunt, Judge. Reversed.

The facts are stated in the opinion of the court.

Chickering & Gregory for Appellant.

Lent & Humphrey for Respondent.

LAWLOR, J.—This is an appeal from a judgment in favor of the plaintiff, Manuel Estrada Cabrera, and against the defendant, Thannhauser and Company, a corporation, in an action brought upon three foreign bills of exchange. The defendant appeals.

In the year 1906, and· for some time prior thereto, appellant was conducting in San Francisco the business of a commission merchant, importer and exporter. During the same period, in the Republic of Guatemala, Triebel and Company had been conducting a similar business. These two firms were correspondents; appellant purchased and sold merchandise and accepted and paid drafts for Triebel and Company in San Francisco, and Triebel and Company performed similar functions for appellant in Guatemala. On the fifth day of September, 1906, Triebel and Company advised appellant that they had drawn six drafts on appellant in favor of the respondent, who was then president of the Republic of Guatemala, five drafts for five thousand dollars each and one for $3,587, a total of $28,587. By the same letter Triebel and Company remitted to appellant thirteen drafts on two business concerns in Hamburg, Germany (these last-mentioned drafts are hereinafter referred to as the Hamburg drafts), aggregating $29,012.94. That letter was in the.

German language and was translated as follows: "Following up our letter of to-day, we still inform you that we were obliged to pay the Government's coffee on the 31st ultimo and consequently drew the following amounts upon you: [listing the six drafts in favor of respondent] begging you to protect these drafts as usual upon presentation. For the reimbursement of above-mentioned amounts, please find enclosed the following remittances [listing the 13 Hamburg drafts] which please credit. As the President will probably retain the drafts for some time yet, we beg you, as we told you formerly already, to negotiate every week Mk. 10000 of above-mentioned drafts, in order that we can make some more profit on the interests." In answer to the foregoing, appellant wrote to Triebel and Company on September 28th: "We wrote you under date of the 21st instant and acknowledged receipt of your favor of the 5th of equal month, contents of which have been duly noted. We have charged to your Coffee Duty account: [listing respondent's 6 drafts] and beg you to send us a signature of the Licentiate [Attorney] Manuel Estrada Cabrera, without which we cannot pay. . . . From the other Mk. 110,000 remitted to us, we shall, according to your desire, dispose of Mk. 10000 every week." On October 30th Triebel and Company sent to appellant "an old document" bearing respondent's signature.

Commencing on September 22d appellant did dispose of about ten thousand marks per week of the Hamburg drafts. The proceeds thereof were deposited by appellant in its general account in a San Francisco bank, and Triebel and Company's Coffee Duty account was credited in the same amounts. Upon each of these occasions Triebel and Company were notified of the credit to their account, and they replied, stating that appellant's Coffee Duty account had been correspondingly debited. On December 31st appellant sent to Triebel and Company a statement of the Coffee Duty account for the six months just closing. This statement showed that the proceeds of the Hamburg drafts had been credited as already stated. It also showed numerous other drafts drawn in the regular course of business by Triebel and Company against the same account, which had been debited therein. A small commission was also shown as having been charged to Triebel and Company for services rendered by appellant in indorsing long term paper, and in allowing

Triebel and Company to use appellant's credit. This charge included the indorsement by appellant of the Hamburg drafts. No account was kept in the books of appellant in favor of respondent. The drafts drawn in favor of respondent were in the ordinary form. They were payable at three days' sight, and gave the direction—"and charge same to our account with advice." Three of the drafts were severally presented to appellant in 1906 and 1907 and were accepted and paid. The three remaining drafts, totaling fifteen thousand dollars, respondent indorsed "for collection" to G. Oetiker & Company, a firm in Guatemala. These drafts were not presented until on or about January 30, 1915. At that time Triebel and Company had overdrawn their account with, and were indebted to, appellant. Appellant refused either to accept or to pay the drafts, they were duly protested for nonacceptance and nonpayment, and on November 17, 1916, respondent instituted this action to recover the total amount of the paper. The case was tried before a jury, which rendered a verdict in favor of the plaintiff for fifteen thousand dollars, with legal interest thereon from January 30, 1915. Judgment was accordingly entered for $18,374.56. The record of this appeal is presented in typewriting.

1. The principal question, as indicated by the pleadings, is whether the transaction by which appellant received the Hamburg drafts created, as to the proceeds of those drafts, the relationship of debtor and creditor between appellant and Triebel and Company or between appellant and the respondent. *McBride* v. *American Lighting Co.*, 60 Tex. Civ. App. 226, [127 S. W. 229], was a case where certain funds had been deposited in Bank A at Boston to be transmitted to Bank B in Dallas, Texas, there to be placed to the credit of C. Bank B knew that the funds were to be devoted to the payment of various claims for construction work which C was having done. Plaintiff D held C's check on Bank B, given to him in payment for construction work, but before he presented the check Bank B suspended payment. D asserted that "said fund was a specific fund for payment of construction claims." The court said: "When money or its equivalent is deposited in a bank without any special agreement, the law implies that it is to be mingled with the other funds of the bank, the relation of debtor and creditor is created between the bank and the depositor, and

the deposit is general. In such a transaction the bank becomes the owner of the fund. When, on the other hand, money or its equivalent is so deposited with an accompanying agreement that the identical thing deposited shall be returned, or that the same shall be paid out for a specific purpose, the relation thus created is not that of debtor and creditor. Such a transaction is a special deposit, and the bank is liable only as bailee. In such a case the fund is a trust fund, the bank acquires no title thereto, and is a mere trustee for the safekeeping, return, or disbursement of the fund, according to the special contract by which the deposit is made. (1 Morse on Banks and Banking, secs. 183, 188; 5 Cyc. 513–515; *Anderson v. Bank,* 112 Cal. 598, [53 Am. St. Rep. 228, 32 L. R. A. 479, 44 Pac. 1063]; *Peak v. Ellicott,* 30 Kan. 156, [46 Am. Rep. 90, 1 Pac. 499]; *Association v. Jacobs,* 141 Ill. 261, [33 Am. St. Rep. 302, 16 L. R. A. 516, 31 N. E. 414]; *Bank v. Weiss,* 67 Tex. 331, [3 S. W. 299]; *Bank v. Weems,* 69 Tex. 489, [5 Am. St. Rep. 85, 6 S. W. 802].)'' (See, also, *City of Miami v. Shutts,* 59 Fla. 462, [51 South. 929]; *Woodhouse v. Crandall,* 197 Ill. 104, [58 L. R. A. 385, 64 N. E. 292]; *Butcher v. Butler,* 134 Mo. App. 61, [114 S. W. 564]; *Citizens' State Bank v. Worden,* 95 Neb. 53, [144 N. W. 1064]; 2 Michie on Banks and Banking, p. 1339.) The rule as to the implication arising upon the creation of a deposit is thus expressed in Tiffany on Banks and Banking, at page 20: ''Where . . . money is deposited for the purpose of paying the indebtedness of a third person, if no contrary instructions are given, it is customary to mingle the money with the funds of the bank, and upon principle it seems that the bank is to be regarded as the debtor of the depositor. In this view neither the depositor nor the beneficiary under the agreement is entitled to any preference over other creditors if the bank fails to apply the funds according to the agreement.'' (See, also, *People v. California Safe Deposit & Trust Co.,* 23 Cal. App. 199, [137 Pac. 1111]; *Plumas County Bank v. Bank of Rideout,* 165 Cal. 126, 138, [47 L. R. A. (N. S.) 552, 131 Pac. 360]; *Newmark Grain Co. v. Merchants' Nat. Bank,* 166 Cal. 203, [135 Pac. 958]; *Bank of Republic v. Millard,* 10 Wall. 152, 155, [19 L. Ed. 897, see, also, Rose's U. S. Notes]; *Burton v. United States,* 196 U. S. 283, [49 L. Ed. 482, 25 Sup. Ct. Rep. 243]; *Minne-*

*sota Mutual Life Ins. Co.* v. *Tagus State Bank*, 34 N. D. 566, [L. R. A. 1917A, 519, 158 N. W. 1063]; *Hendrix* v. *State* (Ala.), 82 South. 564; 1 Morse on Banks and Banking, 5th ed., sec. 210; 7 C. J. 631, note 4.) In *Schofield Mfg. Co.* v. *Cochran,* 119 Ga. 901, [47 S. E. 208], A had pledged a quantity of yarn with B as security for a loan. C, desiring to purchase the yarn, deposited the purchase price in the bank, of which the defendant later became the receiver, to the account of B, and the yarn was released. It was known to the officers of the bank that the sole purpose of the deposit was to obtain the release of the yarn, but no special instructions were given with regard to the funds deposited. It was held that the deposit was a general one, the court saying: "The fact that the president of the bank knew that the payment . . . was being made for the sole purpose of releasing the yarns . . . has no bearing upon the character of the deposit. *The reasons which influenced the plaintiff to make the deposit . . . were, in the absence of special instructions on the subject, of not the slightest concern to the bank, and could not . . . affect the nature of the transaction as a general deposit."* (Italics ours.) (See, also, *Dearborn* v. *Washington Savings Bank*, 13 Wash. 345, [42 Pac. 1107]; *Myers* v. *Twelfth Ward Bank*, 28 Misc. Rep. 188, [58 N. Y. Supp. 1065].) From the foregoing authorities these conclusions may be drawn: **[1]** When, in the regular course of business, one person sends to another drafts or bills of exchange for collection or sale and does not specifically direct that the funds realized therefrom are to constitute a special deposit, they become a general deposit. Even if the reason for the remittance be known to the depositary to be the payment of an obligation owed by the depositor to a third person, nevertheless the depositor must, at the time of making the deposit, specify that the funds are to be kept apart from other moneys of the depositary and devoted only to the payment of the depositor's debt.

So much for the implications which the law will draw in the absence of evidence of the express intention of the parties as to the creation of a general or special deposit. This brings us to consider the question whether, according to the evidence admitted in this case, the express intention of the parties was that the proceeds of the sale of the Ham-

burg drafts should constitute a general or a special deposit. Certain evidence offered by appellant as tending to show "that there was no . . . specific deposit intended to be created," but "that this was one item in a general run of accounts," was rejected and these rulings we shall take up under another head. In *Aetna Nat. Bank* v. *Fourth Nat. Bank,* 46 N. Y. 82, [7 Am. Rep. 314], A was the maker of a certain promissory note for five thousand dollars, due April 4th. April 2d, A sent to the defendant bank a check in its favor for $4,895, inclosed in a letter containing this request: "which [the inclosed check] please credit our account, and charge us our note of five thousand dollars, *due the 4th instant.*" (Italics ours.) On April 3d, A's note for five thousand dollars, *due April 2d* was paid by the defendant and the amount thereof charged to A's account. Subsequently the plaintiff presented for payment the note described in the letter containing the check, but payment was refused. The plaintiff claimed the right to recover upon the theory that the proceeds of the check constituted a deposit for the specific purpose of paying the note due April 4th. The court said: "The direction was to *credit* the account with this sum; and this direction was complied with, and the relation of debtor and creditor, between the defendant and the Florence Mills [A] . . . was the result" (Italics ours), and held for the defendant. In *Young* v. *Bundy* (Tex. Civ. App.), 158 S. W. 566, the plaintiff deposited with some private bankers a deed to certain property owned by him, to be turned over to the vendee of said property upon receipt of two hundred dollars, which he instructed the bank to place *to his credit.* The bank received the two hundred dollars, placed it to his credit, and later paid it out upon a forged check. The bank claimed that the two hundred dollars constituted a special deposit, as to which they were responsible only to the extent of using reasonable care. The court held that no special deposit was established because the plaintiff's direction to place the money *to his credit* and the action of the bank in so doing brought into existence the relationship of debtor and creditor. We quote from the opinion: "Appellee testified it was the agreement that, when the deed was delivered and the money paid for the lots, the bank should deposit the sum in the bank *to his credit.* The undisputed

evidence is that, when the cashier's check was received, the bank placed the amount in the bank as a deposit to the credit of appellee, subject to check, in the usual and ordinary course of business." (Italics ours.) In the case of *In re Broad, Ex parte Neck* (Court of Appeal), L. R. 13 Q. B. Div. 740, A was a banker in London and B a merchant in Sweden. On July 13th B remitted to A a sight draft on C for 450 pounds, inclosed in a letter containing the following instruction: "Inclosed I beg to remit £450 at sight on Westenholz Brothers, which please encash to my credit." A replied: "We are in receipt of your favor of the 13th instant handing a cheque for £450, . . . which is noted to the credit of your account." The court said: "It is suggested that there was a specific appropriation so far as regards this particular transaction, and reliance has been placed on Thomsen's letter of the 13th of July. . . . But the terms of that letter seem to me to be entirely in accordance with the usual practice. No doubt the general ground or reason why the remittance was made was, that bills drawn by Thomsen [B] on Neck [A] were becoming due, . . . but an authority to 'encash' the remitted bill, and to carry the amount to Thomsen's credit, is contained in this very letter."

In the light of these authorities let us examine the letters that passed between the parties here: First, as to the letter of September 5th. The phrase "for the reimbursement of above-mentioned amounts," in our opinion, meant that the proceeds of the sale of the Hamburg drafts were to "reimburse" *appellant* for any sums it might be called upon to pay out on Triebel and Company's account. There are numerous decisions to the effect that similar words do not mean that a remittance is to constitute a fund to be exclusively devoted to the payment of a particular obligation, but are employed merely to indicate to the drawee "his means of reimbursement." (*Corbett* v. *Clark*, 45 Wis. 403, [30 Am. Rep. 763]. See, also, *Redman* v. *Adams*, 51 Me. 429; *First Nat. Bank* v. *Lightner*, 74 Kan. 736, [118 Am. St. Rep. 353, 11 Ann. Cas. 596, 88 Pac. 59]; *Macleed* v. *Snee*, Ld. Raym. 1481, [93 Eng. Reprint, 833].) The most significant language, as showing the intention of Triebel and Company in respect to the character of the deposit, is, "please credit." It would seem clear that if a

fund is to be "credited" the result must be the relation, not of trustee and beneficiary, but of debtor and creditor. As we have seen, such was the conclusion of the court in the Aetna National Bank case, in *Young* v. *Bundy, supra,* and in *In re Broad, supra.* The language of the letter was not, as respondent contends, to "credit to the specific purpose of paying the Cabrera drafts," but only to credit. It will be noted that Triebel and Company also asked that the Cabrera drafts be protected "as usual upon presentation." Such a request was inconsistent with any intention that said drafts were to be payable out of a particular fund. Moreover, the sale of the Hamburg drafts was directed "in order that *we* can make some more profit on the interests." (Italics ours.) If it had been intended to establish a special deposit the payee of the Cabrera drafts, and not the depositor, would have been entitled to the interest which might accrue on the funds deposited.

No account was ever opened on appellant's books in the name of respondent, but, as the Hamburg drafts were disposed of, appellant notified Triebel and Company of the fact that said drafts had been sold and Triebel and Company's Coffee Duty account credited with the respective amounts received. Triebel and Company replied that appellant's Coffee Duty account with them had been debited in the same amounts. Had Triebel and Company intended that the proceeds of the Hamburg drafts were to constitute a deposit for the specific purpose of meeting the drafts in favor of respondent, they would have adopted a different course than the entry of the proceeds in a form whereby appellant was designated as their debtor. Each of the drafts in favor of respondent was at three days' sight, and, according to the letter of September 5th, had already been delivered to respondent, who was, therefore, at liberty to forward them at any time to appellant for acceptance and payment. It is true that Triebel and Company advised appellant that the respondent "would probably retain the drafts for some time yet," but apparently this was merely a surmise, and there is no evidence that there was any agreement that respondent would not present the drafts at once. Three days after acceptance the drafts would become due and payable. If the proceeds of the Hamburg drafts had been intended as a deposit for the spe-

cific purpose of meeting respondent's drafts, it would have been necessary, however, for him to have waited until said Hamburg drafts, payable at ninety days' sight, had been accepted and paid in Germany. If the respondent had presented his drafts before such acceptance and payment, appellant would have had no funds other than its general funds out of which to pay them. While appellant was authorized to sell the Hamburg drafts in order to meet respondent's bills as presented, nevertheless, in order to make such disposal, appellant was obliged to indorse them, thus incurring a liability which only terminated when they were paid in Hamburg. In other words, in order to be prepared to meet respondent's bills, payable at three days' sight, appellant had the alternative, to be prepared to make such payment out of its general funds—which would create the relationship of debtor and creditor between Triebel and Company and appellant—or to sell the Hamburg drafts after indorsing them for payment—which fixed upon appellant a liability contingent upon the nonpayment of the drafts in Germany. Triebel and Company, in the letter of September 5th requested appellant "to protect these drafts *as usual upon presentation.*" (Italics ours.) And the Cabrera drafts themselves, after ordering appellant to pay the respective amounts thereof, contained the direction: "Charge to our account." The above-quoted language shows that the Cabrera drafts were intended by Triebel and Company to be paid three days after presentation in the regular course of business, and that the amounts paid were to be debited to Triebel and Company's account. Thus respondent's position involves the strange contention that the parties intended to create a fund to be exclusively devoted to the payment of the Cabrera drafts, which fund might not come into existence, or at least would not be in a form available for the payment of those drafts until after they, in the usual course of business, had been accepted and paid.

The request for a specimen signature of the respondent did not tend to show that appellant had accepted the Hamburg drafts as a trust fund. Whether or not such drafts were to be devoted exclusively to the payment of respondent's bills, appellant was probably desirous of paying such bills to the proper party, and S. T. Leffmann, appellant's

secretary, testified that it was the custom of appellant "always to have the signatures of persons whose drafts were drawn on the company." Respondent contends that "the acts of appellant in charging the Coffee Duty account with the Cabrera bills and in rendering the special account of December 31st . . . are conclusive evidence that the agreement . . . was for a special deposit." It appears, however, that the two sets of drafts were not entered against each other. They were listed in the same account, but that account contained many other items, none of which had any connection with this transaction. The Cabrera drafts were all debited on September 22d, while the Hamburg drafts were credited as they were sold, over a period from September 22d to November 19th. The account does not purport to show out of what funds payment of respondent's drafts was to be made. Regarding the meaning of the entry of the Cabrera drafts, Leffman testified: "When we get advices of these drafts, it is our custom to charge them right away on the presumption that they would come in in two or three days, even before we got through with our work." This testimony was not controverted. The entry of the Cabrera drafts meant, therefore, that appellant was, from the time of making the entry, prepared to pay the drafts when presented. They were debited on September 22d. On that day, prior to said entry, the account showed a balance against Triebel and Company of about nine hundred dollars. The only items credited to Triebel and Company on September 22d were the proceeds of two of the Hamburg drafts, amounting to $3,482.80. As already noted, the total of the Cabrera bills was $28,587. Obviously, payment of respondent's drafts was not to be made from the proceeds of the Hamburg drafts, for when appellant, by its entry of the former, signified that it was prepared to accept and pay them, no such funds were shown by the account. It is plain that the intention of the parties was that respondent's drafts should be payable out of Triebel and Company's general account with appellant. In each of the cases cited by respondent in support of its contention that this was a deposit for a specific purpose the intention of the parties was assumed, and hence those authorities can have no application here. [2] In our opinion it is clear from the evidence that the remittance of the

Hamburg drafts did not constitute them a deposit to be devoted to the specific purpose of meeting respondent's drafts, and the jury, therefore was not justified in finding for the plaintiff.

2. Since the judgment must be reversed, it will be proper to discuss other questions raised by appellant. The first of these is, "Whether the trial court erred in its rulings on evidence." Appellant first assigns error in the exclusion of a letter written by respondent to appellant under date of March 13, 1915. In this letter respondent, referring to an adjustment and settlement of the account of B. Millan & Company, regarding which appellant had asked respondent to "use his good offices," stated, "I cannot intervene in this matter as it seems entirely foreign to me." The court on its own motion, "subsequent to the trial," procured an independent translation of this letter from the original Spanish, reading, "That matter appears to me to be entirely foreign with my intervention in the matter of the protested drafts," which translation, although appearing in the bound volume of the transcript before us, is not certified by the official reporter or the judge. We find in the record no stipulation that this translation may, nevertheless, be considered on appeal. Indeed, at the time the first translation was offered in evidence, counsel for respondent stated that no point would be made that the translation presented had not been proved. In view of this state of the record, we are unable to consider the translation made after the trial. Appellant claims that the letter tended to show that respondent "had no longer any rights in the drafts," and, therefore, "that prior to the time this action was commenced, respondent had ceased to be the owner and holder of the drafts in suit." The facts surrounding the sending of the letter are: As already shown, respondent had in'dorsed his drafts to G. Oetiker & Company "for collection." Subsequently they were presented, but acceptance was refused, and appellant wrote to respondent under date of February 8, 1915, stating that the reason for nonacceptance was that Triebel and Company, the drawers, were responsible for the account of the Millan Company, which was overdrawn, and requesting respondent to "use his good offices" in adjusting and settling the last-mentioned account. [3] We think the evidence was properly excluded.

The language of the letter shows that respondent did not consider that the adjustment of the Millan account concerned him in any way, but that he regarded appellant as responsible to him independently of such account.

Appellant also claims that ''the court was in error in excluding evidence showing the course of dealings between appellant and Triebel and Company at and prior to . . . the letter of September 5, 1906.'' The court, in sustaining respondent's objections to this class of evidence, ruled that ''this plaintiff is not concerned with the course of dealings between the defendant and Triebel and Company with respect to other transactions not involved in this case. . . . To go into the general account and what their course of dealings was in other transactions and other matters is wholly immaterial in my opinion.'' The rule involved is thus stated in 22 Corpus Juris, 1183: ''Previous and contemporaneous transactions may properly be taken into consideration to ascertain the sense in which the parties to a writing used particular terms.'' (See, also, *First Nat. Bank* v. *Bowers,* 141 Cal. 253, 262, [74 Pac. 856]; *Fee* v. *McPhee,* 31 Cal. App. 295, 316, [160 Pac. 397]; *Peters Shoe Co.* v. *Murray,* 31 Tex. Civ. App. 259, [71 S. W. 977].) In the letter of September 5th we find the terms ''protect . . . as usual upon presentation,'' and ''please credit.'' **[4]** Plainly, if the Cabrera drafts were to be protected ''as usual,'' this evidence was admissible to show that these terms did not mean that the drafts were to be paid from a special deposit, but out of appellant's general fund. Moreover the understanding between Triebel and Company and appellant is to be determined from a consideration of the entire course of dealings between them, of which the correspondence was only a part. It is also settled that proof of subsequent dealings, tending to show the meaning which the parties placed upon a writing or contract between them, is admissible. (*Mayberry* v. *Alhambra etc. Co.,* 125 Cal. 444, 446, [54 Pac. 530, 58 Pac. 68]; *Keith* v. *Electrical etc. Co.,* 136 Cal. 178, [68 Pac. 598]; *Mitau* v. *Roddan,* 149 Cal. 1, 15, [6 L. R. A. (N. S.) 275, 84 Pac. 145]; *Woodard* v. *Glenwood etc. Co.,* 171 Cal. 513, 521, [153 Pac. 951].)

Appellant next assigns error to the exclusion of ''evidence showing the state of Triebel and Company's credit

with appellant at the time of the writing of the letter of September 5th." Appellant asserts that, in another letter written on the same day by Triebel and Company to appellant—September 5, 1906—Triebel and Company admitted "the firm was in the debt of appellant to the extent of over fifteen thousand dollars," and, therefore, it is claimed, the letter was admissible upon the theory that "a depositor [Triebel and Company] at a bank, who is about to draw a check [respondent's drafts] in excess of his then existing account, will naturally deposit further funds [the Hamburg drafts]." [5] We think this contention is correct. If the appellant could prove that at the time of the remittance of the Hamburg drafts Triebel and Company were indebted to appellant, an inference might properly be drawn that the remittance was intended to replenish the general account.

Appellant's fourth assignment of error in the rulings upon evidence is the refusal to admit a letter dated September 18, 1909, in which Triebel and Company requested appellant "to book the balance of the Coffee Duty account in the general account." [6] It seems to us that this letter was admissible as tending to show that Triebel and Company regarded the Coffee Duty account as a general account, and that, therefore, as already shown, they acquiesced in appellant's action in crediting to this account the proceeds of the Hamburg drafts.

3. Appellant has assigned error to the refusal of the court to give certain instructions which it proposed, but in view of our statement of the law any error in this connection will be avoided on another trial.

Judgment reversed.

Shaw, J., Olney, J., Wilbur, J., Lennon, J., and Angellotti, C. J., concurred.