L. A. ANDREW, State Superintendent of Banking, Appellee, v. WATERVILLE SAVINGS BANK, Appellee; JOE BANZER et al., Interveners, Appellants.

APRIL 3, 1928.

*M. X. Geske,* for appellants.

*G. B. Richter,* for L. A. Andrew, appellee.

MORLING, J.—Hart was engaged in live-stock business, farm-

ing, and running a meat market. He had one bank account for all his business. He was accustomed to issuing checks for cattle purchased, and at time of shipment, making draft on the consignee, payable to the cashier of the bank which is now insolvent. This draft would be credited to Hart's general checking account in the bank, and the checks issued for the cattle as they came in would be paid from it. About November 27 and 28, 1925, Hart bought cattle of intervener and his assignors, and gave them his checks on the insolvent bank for the purchase price. For convenience, the sellers will be referred to as interveners, as if each had filed a separate petition of intervention. There were six cars of cattle. Hart testifies that, on Saturday, November 28th, he told the cashier of the insolvent bank to make a draft on a commission firm named, for $8,500.

"The cashier said, 'You must be shipping a lot of stuff.' And I told him that two loads were shipped from Monona, two from Harper's Ferry, and two from Waterville. I said to him, 'Make a draft for $8,500, to cover those checks.' That I was buying the cattle and doing the business which Arneson, cashier, knew about. Cattle were billed out by me in the name of Peter Arneson by previous arrangement, which has extended over a period of about four years. The arrangement was, I should bill the stuff in his name, and he would draw on the commission firm the stuff was consigned to. They were furnishing me the money. The reason he did that was so the bank wouldn't be out their money. Under our arrangement, he made the draft to pay for the stock purchased, for which checks had been issued and were outstanding. * * * Arneson drew on the commission company for $8,500, and I got credit for $8,500, as soon as he drew, to pay the checks outstanding for these several cars of cattle."

He says that the arrangement between Arneson and himself was for convenience of both, "and get the money right away * * * Never told Arneson who I bought from."

Hart also says:

"Under the arrangement made with Arneson about four years ago, the credit for $8,500 in the bank should have been to pay for the outstanding checks for the cattle."

Arneson testifies that Hart told him to issue a draft on a commission firm in Chicago for $8,500; that he drew on the commission firm, and credited Hart with that amount.

"It was our general practice to bill the cattle in my name, which practice began perhaps three or four years ago; and I was to make a draft for what Hart would tell me, and I would credit Hart for the amount. The original understanding was to finance Hart's checking account; to take care of outstanding checks he had issued for cattle. This transaction, on November 28, 1925, was just like all others, and according to our first understanding and agreement. The draft for the amount, $8,500, was made upon the Chicago Commission Company, to the Illinois Merchants Trust Company, correspondent bank, and credited by them to the Waterville Savings Bank. The last day the Waterville Bank did business was November 28, 1925. * * * Mr. Hart had one account in the Waterville Savings Bank. Hart's checks were drawn against the general checking account. Any check that came to the bank signed by M. J. Hart or Joe Tysland were charged to this account."

The witness says that all the deposits that Hart had anything to do with "were put in the same class and category, regardless of what they were."

On that day, November 28, 1925, two deposits were made,—the one for $8,500, and one for $34. Withdrawals that day amounted to $3,403.70. Balance at close of business, $8,066.29.

On December 12, 1925, Hart wrote to interveners, stating that he was informed that his check was not presented to the bank before it closed.

"I am keenly sorry for this. My balance on checking account at time bank suspended was $8,066.29; and same is now unavailable for any purpose because of bank being placed in hands of receiver.

"It is confidently expected and hoped, however, that an examination of the bank's affairs will disclose that it is solvent, and that it may open again for transaction of business at an early date, and that no depositor or holder of its paper will suffer any actual loss.

"It is unfortunate that your check did not reach the bank before it closed, but I hope everything will turn out all right in the end."

The receiver applied Hart's balance upon a note which the bank held against him.

Creditors were required to file claims on or before February

12, 1926. Notice was published. Interveners do not claim that they did not know about the order. Petition of intervention was filed July 27, 1926.

Interveners' contention is that the $8,500 was deposited for the specific purpose of meeting their checks, and that it was a special or specific deposit or trust fund for that purpose.

Hart and interveners have sustained an obvious injury by the failure of the bank, but no greater than have other depositors. Interveners' (or Hart's) controversy is not now with the bank, but with creditors. The complaint is not that interveners were entitled to have the deposit (as a general deposit) applied to their checks, and have been debarred of the right to such deposit by appropriating it to the payment of the note held by the bank. The claim is that the deposit itself, or the funds represented by it, belong to interveners as a trust fund. The rights of interveners or Hart must be determined, not upon the obvious injustice of the loss which they will sustain by the diversion of the purchase price of the cattle from the payment of the debt incurred for them, but upon recognized legal and equitable principles governing the title to the funds.

Interveners parted absolutely with the title to their cattle. They took Hart's checks for the price. Barring any right to follow the cattle, their recourse was upon Hart for the price, or upon the checks which he gave. The checks gave interveners no right of action against the bank, and the checks did not, of themselves, constitute an assignment of any funds which were then or would be in the future to Hart's credit at the bank. There is no evidence of any arrangement between Hart and interveners whereby the proceeds of the cattle were to be deposited in the bank for interveners' benefit, or whereby any measures were to be taken by Hart with respect to the checks or Hart's funds for their benefit. The interveners originally were merely the ordinary holders of checks upon the bank, without special equities against the bank.

Hart shipped the cattle to a commission house for sale. The commission house was Hart's agent. The cattle remained Hart's property. Hart drew upon his agent, the commission house, in anticipation of shipment to and sale by it. When Hart drew the sight draft, he was still the owner of the cattle. The commission house was under no obligation. It was not certainly known that

that house would ever receive or account for the cattle. The bank had knowledge of these facts, and with such knowledge, received the sight draft, and gave Hart credit for the amount. The only liability on the draft at that time was Hart's liability. The bank, therefore, gave Hart credit on account for Hart's liability on the draft and anticipated sale of the cattle. The draft, by Hart's direction, was placed to his credit in his general checking account, and the bank became Hart's debtor for the amount, subject to the bank's right to charge back the draft, if it should be dishonored. Up to this time, interveners had no cause of action against the bank or claim upon any funds in the bank, unless it was by reason of Hart's direction, as he testifies, to the cashier to "make a draft for $8,500 to cover those checks," coupled with the testimony of Hart and the cashier that:

"The original understanding was to finance Hart's checking account, to take care of outstanding checks he had issued for the cattle. This transaction on November 28, 1925, was just like all others, and according to our first understanding and agreement."

No checks or holders of checks or amounts were specified or named. The bank did not agree to pay any checks or persons, or act for their benefit. At that time, the bank had as much of a claim against Hart on the sight draft as interveners had against Hart on the checks, and more than interveners had against the bank, which could not be sued by them. Code of 1927, Section 9650. The case is no different, in substance, from that of an ordinary loan or deposit and credit to a general checking account. It is always understood that the bank will pay from a general deposit account checks that have been or shall be issued against it. The relationship between the bank and Hart was no different, in the case before us, from the case of deposits as generally made. Interveners were in no wise named. No agreement purporting to be intended for their special benefit was made. Nothing was done that would deprive Hart of the right to immediately check out his balance. If Hart, within the next hour, had presented his check, or if someone had presented Tysland's check against the account, the bank would have had no excuse, so far as interveners are concerned, for not paying it. The bank was no more directed to pay interveners' checks than it was directed to pay any checks of Hart's or Tysland's that

might be presented, nor under any greater liability to do so. The legal and equitable title to the draft was in the bank. The bank was the owner of the draft. The bank became debtor to Hart for the amount; for the $8,500 was by the bank, with Hart's knowledge and consent, credited to Hart. There was no trust. In this state of affairs, the bank closed. The deposit cannot be paid in full unless the $8,500 subsequently realized on the draft is taken out of the general assets and appropriated to such payment. The interveners had no title to the sight draft or to the funds to be realized from it. The money which Hart was to get on the sale of the cattle was his money, and not interveners' money. He stood then, and stands now, not the holder of interveners' property, but merely as a debtor to interveners. The bank is not the holder of interveners' property. The deposit was sufficient to pay the checks, and the checks would have been paid, if the bank had not failed. Hart's instruction to the bank to pay the checks was to pay them out of this credit. Full force being given to the arrangement which Hart and the cashier say was originally made, it was, at the most, that the deposit should be used to pay interveners' checks. If a depositor should say to a bank that he had given a number of checks which would overdraw his account, and would have to borrow, and should request a loan of $8,500 to keep his account good, and should say that he was expecting funds from the proceeds of merchandise which he was shipping, and would have such proceeds credited to the bank for use in paying the loan, and should give his note, and get credit in his checking account accordingly, probably no one would contend that the bank would thereby assume any duty or liability to the holder of an outstanding check, or would be subject to action on such check, or to a liability to account to check holders for the proceeds of such loan. There would be an entire absence of contract with the check holder, or with the depositor for the check holder's benefit, and an entire absence of any trust relationship. In order to hold the bank liable to the holder of a check, it must have made some agreement, express or implied, by which it assumed a duty or obligation. The claim of the interveners is, therefore, that of the holders of checks, against the deposit. It is not that of the owner of funds belonging to them in the hands of the receiver. The relationship between Hart and the bank was that of bank and general depositor. The

law cannot convert this definitely assumed relationship into a trust.

*Dolph v. Cross,* 153 Iowa 289, was decided upon the allegations of the intervener in a garnishment under execution against the depositor, in which the bank was garnished, and in which it was alleged by the depositor that he told the receiving officer of the bank, at the time, "that he made the deposit for the purpose of meeting checks which he had already issued, as against such deposit, and that the deposit was made to take care of said checks," and that he, "upon making said deposit, informed said bank that the funds so deposited were deposited to meet the payment of checks he had already drawn." The averment stricken out included also that:

"The deposit was made as a special deposit, to meet the intervener's check and another which defendant had issued, and that his right thereto was superior to that of garnishing plaintiff."

This court construed these averments to "show that the execution defendant made the deposit for the specific purpose of meeting the checks which he had just issued, and this fact was made known to the bank officials at the time of the deposit. The form of the bookkeeping was not controlling. That was a mere matter of convenience. The bank officials understood that they received this money for the express purpose of paying checks already issued for that exact amount. Whether the facts pleaded show an equitable assignment to the check holders we need not determine. The deposit was special, and not general. It was made for the benefit of the particular check holders. The bank received it as such. It is enough to say that the contract of deposit was made for the benefit of third parties, and that such third parties were entitled to avail themselves of it. If the bank itself had been a creditor of the depositor's, it could not have applied such deposit upon its own claim."

The statement that the bank could not have applied the deposit on its own claim, though *obiter,* was correct; for the bank received the deposit, a particular sum, as alleged, and as accepted by the court, as a special deposit. The statement in the opinion that the deposit was special, and not general, was a reiteration of the allegation of the pleading which the trial court struck from the files.

In *Smith v. Sanborn State Bank*, 147 Iowa 640, plaintiff took to the bank a check payable to himself, to get the money on it. He informed the banker that he wanted the money to pay a rent claim of $40, and the balance to pay the expense of immediate medical treatment of his wife, whom he expected to remove to a hospital the next day; and that the money was necessary, to enable him to do so. The banker told plaintiff that the safe was locked, but that he could leave the draft as a deposit, with a check for $43 to cover the rent and an item of $3.00 which he was owing the bank, and the remainder could be drawn by him as the money might be needed in the treatment, of his sick wife. The next day, plaintiff, having given checks for part of the amount, asked the bank for the remainder, but was informed that the bank had applied it upon a note which it had against plaintiff. The court said:

"Of the general rule that a bank to whom a depositor is owing a matured indebtedness may appropriate the general deposit of its debtor to the discharge of the obligation, there can be no doubt. * * * But it is no less certain that a deposit made for a special purpose or under a special agreement cannot rightfully be so appropriated. * * * Indeed, the proposition that a bank enjoys no exemption from the general rule by which every party to a business transaction or agreement is legally bound to respect the obligation of his contract is one which ought to require neither argument nor citation of authority. The evidence shows without dispute that the check for $200 was placed with the defendant upon the express agreement and understanding that, after paying certain specifically named debts, the remainder would be repaid to the plaintiff on the following day, or whenever called for, to enable him to take his wife to the hospital for needed treatment. Upon money so received, no lien attached in favor of the bank, and its attempt to appropriate the same was wholly without right or authority."

The plaintiff took the draft to the bank for the express purpose of getting the money to use for certain purposes. He was induced to leave it there by the representation that $43 of it would be used to pay a check which he was then directed to draw, and the balance would be paid to him the next morning. He drew checks for part of the balance, but the bank refused to pay all of it, according to its contract. There was no intention

there of making a general deposit to a general checking account, and to leave the draft there as a general deposit, to pay any checks that plaintiff had drawn or might draw; that particular draft was immediately placed in the custody of the bank for a particular purpose, which the bank agreed to respect. It was, in effect, leaving with the bank $200, with agreement to pay out $43 for certain purposes and pay the plaintiff the balance the next morning. The checks that were drawn would be a proper and ordinary method of carrying out the arrangement.

In *Hanby v. First Sav. Bank,* 197 Iowa 150, it was (or might have been) found that Foust left with defendant bank a check, saying that he wanted it listed separately from his account, as a certain amount of it belonged to plaintiff, but the exact amount he did not know; that later, plaintiff asked the cashier if the money was in the bank, and the cashier replied that Foust had left the money, and he, the cashier, would take care of it. It is said in the opinion:

"A bank to whom a depositor is owing a matured indebtedness may appropriate the general deposit of its debtor to the discharge of the obligation. * * *. a deposit made for a special purpose or under a special agreement or with knowledge or notice on the part of the bank of its trust character cannot lawfully be so appropriated."

There, the fund to the amount of plaintiff's claim was put in the bank, not as a general deposit, but to be set apart as a particular fund for the specific purpose of paying plaintiff.

In *First Nat. Bank v. Propp,* 198 Iowa 809, there was a deposit of a specified sum "for the following specific purpose on which I have this day issued checks to the following named persons * * * [listing them]. All of said checks having been issued and are now outstanding and drawn as against this special deposit and you are hereby directed to charge said account with the total amount of said checks as of this date, * * * the above deposit is being made for the specific purpose of taking care of said checks," so far as necessary. The court there said:

"The written direction to the bank as to the disposition to be made of the fund expressly declares it to be a special deposit, and designates the particular purpose for which it is made. * * * The form of bookkeeping of the bank was not controlling."

In *McLennan v. Farmers' Sav. Bank,* 131 Iowa 696, Webb

was buying hogs for Breed upon commission, had no interest in them, and was not authorized to ship them in his own name. Webb did not claim the hogs or the proceeds. The proceeds were deposited in defendant bank in Webb's name by mistake. It was held that the bank had no right to apply them to Webb's indebtedness.

See *Porter Auto Co. v. First Nat. Bank,* 185 Iowa 844. In *In re Security Sav. Bank* (Iowa), 211 N. W. 233 (not officially reported), live stock owned by various persons was shipped in the name of an association to a commission firm in Chicago, there sold, and proceeds deposited in a Chicago bank to the credit of a Perry bank. The Perry bank, on notice of the credit in Chicago, gave credit to the shipping association, in accordance with custom, which was that, upon receipt of advice from the commission company, it would draw checks and leave them at the Perry bank for delivery to the owners. We said:

"The bank, however, did not hold the money as trustee of the shipping association or of the individual shippers, nor did it sustain any relation of agency to them. The manager of the shipping association was, at most, the agent of the shippers, charged with the duty to make proper deposit and distribution of the proceeds of the sale. The deposit was in all respects general, and in no sense special. It is immaterial what the officers of the bank knew as to the relationship between the shipping association, its manager, and the shippers, or their method of transacting business. The funds thus deposited could only be paid out by the bank upon the order of the shipping association. No trust relationship was created by the transaction * * *. The transaction was not different, in legal effect, so far as a trust relationship is concerned, from what it would have been if the amount due each shipper had been originally credited to him by the bank."

It cannot be said here that the bank did not take title to the sight draft, nor that Hart did not take title to the credit that was given him for the sight draft. It cannot be said, on this evidence, that the bank received a particular fund to hold to pay out for a specified purpose, or that it was directed so to do and received the funds in trust in pursuance of such direction. As Hart testifies:

"They were furnishing me the money. The reason he did

that was so the bank would not be out their money. * * * Arneson drew on the commission company for $8,500, and I got credit for $8,500, as soon as he drew, to pay the checks outstanding for these several cars of cattle.''

. Arneson testifies:

''The original understanding was to finance Hart's checking .account; to take care of outstanding checks he had issued for the cattle,'' and he ''would credit Hart for the amount. * * * Hart's checks were drawn against the general checking account. Any checks that came to the bank signed by M. J. Hart or Joe Tysland were charged to this account.''

In *Poland v. Love*, 91 C. C. A. 466 (164 Fed. 186), in the circuit court of appeals for this circuit, the court refers to *Fourth Street Bank v. Yardley*, 165 U. S. 634, as holding that, while an equitable assignment or lien will not arise against a depositor solely by reason of a check drawn against it, ''yet if, in connection with the delivery of the check, it was the understanding and agreement of the parties that an advance about to be made should be a charge on and be satisfied out of a specified fund, a court of equity will lend its aid to carry the agreement into effect as against the drawer of the check, mere volunteers, and persons charged with notice,'' but as to the case before it, said:

''The case is the common one of a man fortifying his bank account to stand a check given against it, and the essential features of an equitable assignment are lacking. The mere giving of a check, and its receipt in the ordinary, usual way, does not amount to an equitable assignment; and this is so, even though the check is drawn for the exact amount of the drawer's balance,''—a doctrine which was affirmed by this court in *Leach v. Iowa State Sav. Bank*, 202 Iowa 894; *Leach v. Treynor Sav. Bank*, 203 Iowa 988.

In the *Fourth Street Bank* case, referred to, 165 U. S. 634, 644, 646, 649, cases are cited on the question of what is necessary to constitute an assignment or equitable charge, among them *Hopkinson v. Forster*, L. R. 19 Eq. 74, where it is said:

'' 'You can have no charge in equity without an intent to charge. The letter on which you rely was not written with any intent to charge the fund; it was a mere letter of instructions to the bankers.' ''

And from another English case, *Thompson v. Simpson*, L. R., 5 Ch. (1869-70) 659:

" 'It is extravagant to say that a man who has an agent employed to pay bills creates a charge on the funds in the agent's hands by the mere drawing of a bill. It is necessary to make out a contract to charge specific funds which were with the Liverpool Bank, or which were on their road thither; for if there was only a personal contract, that would give nothing but a right of action.' In the same case, Lord Justice James observed (p. 662) that, 'when it is attempted to make out, in addition to the written contract contained in a bill of exchange, a collateral parol agreement, it is most important to have clear and satisfactory evidence as to the exact words used.' "

In *In re Interborough Consol. Corp.*, 288 Fed. 334, 347, it is said:

"If a fund is deposited in a bank for a specific purpose, but subject to the depositor's check, it remains the property of the depositor, and is subject to the right of set-off. Continental Trust Co. v. Chicago Title Co., 229 U. S. 435, 446, 33 Sup. Ct. 829, 57 L. Ed. 1268. Such a right is necessarily inconsistent with the existence of a trust. The right of set-off negatives the existence of a trust. * * * Every person who receives money to be paid to another, or to be applied to a particular purpose, to which he does not apply it, is a trustee, and may be sued either at law for money had and received, or in equity as a trustee for a breach of trust. Taylor v. Benham, 5 How. 233, 274, 12 L. Ed. 130; Kane v. Bloodgood, 7 Johns. Ch. (N. Y.) 110, 11 Am. Dec. 417. But in this class of cases the fund is in the possession and control of the trustee, who is bound under his contract to apply it in accordance therewith, and for no other purpose. And in the instant case, the trust company assumed no obligation to the petitioner as respects the debt herein involved—its only obligation, under its contract with the bankrupt, being to pay such checks as the bankrupt might draw against the fund—and the petitioner had no such checks."

Here, interveners have checks, and have the rights of holders of checks, but not the rights of beneficiaries of a trust fund. There was no express or agreed purpose to create a trust for them. The court further says in the *Interborough* case (288 Fed. 334, 349):

" 'You can have no charge in equity without an intent to charge.' The intent to *charge* is not made out in this case. It is not established simply by showing that the fund in controversy was originally deposited with the intention that it would be checked out to pay interest on the coupons, but without any agreement with the coupon holders that it would be so used. A particular fund is not 'charged' unless it is bound for the performance of an obligation imposed. * * * It seems to us perfectly plain that, if A deposits a sum of money in a bank, intending to use it to pay B what he owes him, but without agreement with B that he is to be paid out of the money so deposited, it cannot be maintained that the fund has been 'charged' with the payment of B's debt, or that any lien or incumbrance has been created in favor of B which prevents A from appropriating the fund to some other use, if he decides to do so. * * * The Empire Trust, in which the fund in question was deposited, was simply the agent of the bankrupt, which deposited it, and which agreed with it that it would pay it out upon the bankrupt's checks when they were presented. As this agreement created a mere agency to transfer the fund on behalf of the principal, the agency, like every other agency not coupled with an interest, was revocable at pleasure, and conferred no title or equitable lien upon any third party or coupon holder.''

In *Cabrera v. Thannhauser & Co.*, 183 Cal. 604 (192 Pac. 45), the syllabus in the Pacific Reporter reads:

"As a general rule, the proceeds of drafts sent to a correspondent for collection become general, not special, deposits, though the correspondent has knowledge of the purpose for which the proceeds were intended to be used.''

The court quotes Tiffany on Banks and Banking, pages 20, 21:

"Where * * * money is deposited for the purpose of paying the indebtedness of a third person, if no contrary instructions are given, it is customary to mingle the money with the funds of the bank, and upon principle it seems that the bank is to be regarded as the debtor of the depositor. In this view, neither the depositor nor the beneficiary under the agreement is entitled to any preference over other creditors if the bank fails to apply the funds according to the agreement.''

The court also quotes from *Schofield Mfg. Co. v. Cochran*, 119 Ga. 901 (47 S. E. 208):

· ''The fact that the president of the bank knew that the payment * * * was * * * for the sole purpose of releasing the yarns * * * has no bearing upon the character of the deposit. The reasons which influenced the plaintiff to make the deposit * * * were, in the absence of special instructions on the subject, of not the slightest concern to the bank, and would not * * * affect the nature of the transaction as a general deposit * * *.''

*American Sur. Co. v. Bank of Italy*, 63 Cal. App. 149 (218 Pac. 466).

See further, in line with our own cases previously cited, *Rowland v. First State Bank*, 121 Kan. 51 (245 Pac. 740); *Iselin v. Farrow*, 115 Okla. 218 (242 Pac. 528); *Southwest Nat. Bank v. Evans*, 94 Okla. 185 (221 Pac. 53); 7 Corpus Juris 632, 660.

Here, interveners' relationship to Hart was that merely of holders of Hart's checks, with no other agreement with him than that shown on the face of the check. The relationship between Hart and the bank was (1) that of drawer and holder of a draft, and (2) that of depositor to general checking account in the bank, with the mutual understanding that checks had been drawn and checks might be drawn, which, as presented, would be paid, with no agreement that the funds should be held for and used in the payment of particular checks,—merely the common understanding that checks drawn and to be drawn should be paid. There was no trust. The deposit was a general one. Hart's are the rights of a general depositor. The interveners' rights are the rights of check holders only, not rights in the fund. See, further, *Andrew v. Marshalltown State Bank*, 204 Iowa 1190; *Border v. State Sav. Bank*, 202 Iowa 27; *In re Security Sav. Bank* (Iowa), 211 N. W. 233 (not officially reported); *Leach v. State Bank of Redfield* (Iowa), 212 N. W. 390 (not officially reported).

The claim for preference was properly denied.—*Affirmed.*

STEVENS, C. J., and EVANS, DE GRAFF, KINDIG, and WAGNER, JJ., concur.