JOE DIEHL, APPELLANT, V. BENJAMIN E. JOHNSON ET AL., APPELLEES.

FILED JULY 29, 1932. No. 28288.

J. E. Porter, for appellant.

F. C. Radke, Barlow Nye, P. E. Romig and Mitchell & Gantz, contra.

Heard before Goss, C. J., Rose, Dean, Eberly, Day and Paine, JJ., and Ryan, District Judge.

Ryan, District Judge.

This action is brought to recover ·upon three checks, totaling $1,230, drawn by B. E. Johnson Company upon the First State Bank of Alliance, on October 5, 1923, in payment of certain horses and. mules purchased by B. E. Johnson Company from the plaintiff and two other farmers in Dawes county; these other two checks having been assigned to the plaintiff for the purpose of collection.

B. E. Johnson Company was a partnership composed of Benjamin E. Johnson and Fred W. Melick. The B. E. Johnson Company was in the business of buying horses and mules and shipping them to Omaha Horse & Mule Commission Company, at Omaha. The evidence discloses that the partners bought small lots of horses and mules from various ranchers and made a small payment on each purchase by means of a check on the First State Bank of Alliance. When a carload of stock had been purchased, the animals would be brought into the shipping point, which in this case was Marsland, Nebraska, and the balance of the purchase price would be paid by checks on the

First State Bank of Alliance. It appears that the partnership had sufficient funds on deposit to meet the small checks given at the time of purchase. At the time of shipment B. E. Johnson Company would draw a sight draft on the Omaha Horse & Mule Commission Company for the aggregate amount of these final payment checks and deliver it to the First State Bank of Alliance, which would immediately forward the draft to Omaha for presentation. The bank would then proceed to honor the checks on the B. E. Johnson Company account, given for the final purchase price of the horses and mules.

In this particular instance, the sight draft was for the amount of $4,450. It had been made out the day before the horses and mules were shipped from Marsland and left in the possession of Charles Brittan, the vice-president of the bank, with instructions to fill in the amount, which would be telephoned from Marsland on the following day after the purchase of the live stock had been completed. Upon receipt of the information, Brittan filled in the amount of the draft, made out a deposit slip for a draft for $4,450 in favor of B. E. Johnson Company and forwarded the draft immediately to the Packers National Bank of Omaha for collection.

This draft was sent to Omaha on Friday. In the usual course of business, the bank would expect returns on it on Monday. Checks totaling $2,081.28 on the B. E. Johnson Company account were presented on Saturday and were paid. On Monday the Packers National Bank reported to the First State Bank of Alliance that the Omaha Horse & Mule Commission Company refused to pay the draft, because they claimed the shipment of stock was not up to representation. The First State Bank of Alliance then refused to pay any more checks on the B. E. Johnson Company account, because of lack of funds.

The three checks involved in this suit were presented to the First State Bank of Alliance on Monday, after having been deposited in the First National Bank of Crawford, and were returned unpaid. They were again presented by

the Crawford bank on Wednesday and were returned unpaid because of lack of funds.

The exact manner in which the B. E. Johnson Company account was handled is not disclosed by the record. It does not appear whether the amount of credit shown by the deposit slip, defendants' exhibit 1, was ever credited to the account of the B. E. Johnson Company. It does appear, however, that after the checks presented on Saturday had been honored the account was overdrawn to the extent of the amount of these checks, $2,081.28. On October 10, 1923, the Packers National Bank of Omaha collected $2,500 from the commission company upon this carload of stock and on October 11, 1923, a further collection of $646.38 was made, making a total of $3,146.38, which was the net sale price of the carload of horses and mules. These amounts took up the overdraft and left a balance of $1,065.10 to the B. E. Johnson Company account. This balance was paid into court in a garnishment proceeding against B. E. Johnson Company, the nature of which was not definitely disclosed by the record. The partners in the B. E. Johnson Company were prosecuted for drawing no fund checks, but were acquitted.

Practically the only disputed point in the evidence concerns the arrangement made by the B. E. Johnson Company with Brittan at the bank, at the time the deal was first discussed. Both partners testify that they borrowed the money at the bank to cover the transaction, but it does not appear that either of them ever signed a note, and the only tangible evidence in the record is the deposit slip, defendants' exhibit 1. Charles Brittan, the vice-president of the bank, testifies that when the sight draft was deposited he took it for collection, and that the credit extended to the B. E. Johnson Company was a conditional credit, and that the B. E. Johnson Company was given the right to draw against this conditional credit in anticipation of the receipt of funds from the commission company to cover the amount of the withdrawals, and that it was understood that the B. E. Johnson Company should make good any overdrafts.

The plaintiff, however, contends that an unconditional credit was given by the receipt of the draft, and that the moneys so credited to the B. E. Johnson Company were deposited by them and accepted by the bank for the special purpose of paying certain checks to be issued in payment for horses and mules to be purchased, and included the three bank checks which are the subject-matter of this action, and that this deposit became at that time, and ever since has been, a trust fund in said bank for this particular purpose.

The only definite testimony with reference to the circumstances of the bank's receiving this draft was that of Charles Brittan, the officer of the bank with whom the transaction was had. He testifies: "On Thursday Mr. Melick came down to the bank and said, 'I am buying some horses,' and he signed a sight draft, and he said, 'I will call you up in the morning and let you know the amount to fill in,' and he drew it on the Omaha Horse & Mule Commission Company, that they had been buying and shipping horses to before. So, on Friday morning, he called me up and told me to fill in that draft for $4,450 which I did, and I sent the draft out on 44, and it should have been in Omaha Friday morning and should have been presented for payment on Saturday morning, and on Saturday we gave them credit, of course subject to the final payment of this draft." The testimony above quoted is corroborated by the events that followed the transmission of the draft to Omaha. On Monday, when the bank learned it had not received credit from its Omaha correspondent for the amount of the draft, it made inquiry and learned that the Omaha Horse & Mule Commission Company had refused payment, that as it had already cashed checks in the amount of $2,081.28, it urged its Omaha correspondent, the Packers National Bank, to press the collection, and $2,500 was paid by the commission company upon the draft, which took up the overdraft in the First State Bank of Alliance. The checks sued upon by the plaintiff had been presented in the meantime and dishonored. Only a small further payment

was received upon the draft and there was never sufficient money in the account to pay these checks at any time when they were presented for payment.

This is the second appearance of this case in this court. When the action was originally commenced, a general demurrer to the petition was sustained in the trial court. Upon appeal this ruling was reversed and the cause remanded to the district court for trial upon the merits. The appellant contends that, under the law of this case as laid down in the commissioner's opinion, a trust fund should be declared in favor of these checks. This contention is based upon the following language in that opinion:

"The appellant, plaintiff, contends that since it is alleged in the petition and admitted by the demurrer that deposit was made and accepted by the bank for the particular purpose of paying checks which B. E. Johnson Company had given for horses and mules a trust relation was created and the case should be ruled by the decision of this court in *Gruenther v. Bank of Monroe,* 90 Neb. 280, and the decisions of the supreme courts of Iowa and North Dakota in *Hanby v. First Savings Bank,* 197 Ia. 150, and in *Morton v. Woolery,* 48 N. Dak. 1132, wherein it is held that, where a person makes a deposit in a bank for a specific purpose of meeting checks to be thereafter issued, the bank on accepting the deposit with that knowledge becomes bound by the conditions imposed and, if the money so deposited is misapplied, it can be recovered as a trust deposit.

"It is elementary that all facts well pleaded must be taken as admitted by a general demurrer. Hence, we have the condition presented by the allegations of plaintiff's petition that a deposit was actually made in the bank and accepted by it for the specific purpose of paying these and other like checks issued in payment of the purchase price of horses and mules. Whether these allegations are true, we have no means of knowing, but we do know that the bank's demurrer admits that they are true."

The record, however, falls far short of proving a special deposit. The taking of the sight draft by the bank and

the issuing of the deposit slip indicate nothing more than the receipt of a collection item. As is said in 6 Michie, Banks & Banking (Perm. ed.) p. 7: "A bank, having received a paper for collection, does not owe the amount thereof to the sender until collected, and though it may enter a credit in its books therefor, such a credit may be treated as provisional if the paper is afterwards dishonored, and it may cancel the credit." It is true that the bank knew the general purpose for which the funds to be derived from the sight draft were to be used, but there is no proof whatever that the funds so derived were to be restricted to the payment of checks given for the purchase price of horses and mules, and, moreover, there is no proof that the bank gave the B. E. Johnson Company an unconditional credit of $4,450, as indicated by the deposit slip. On the contrary, the evidence is that the credit given was conditioned upon the payment of the sight draft by the Omaha Horse & Mule Commission Company. This conclusion is borne out by the testimony adduced at the trial and also by the testimony of Charles Brittan given in the case of State of Nebraska v. B. E. Johnson and F. W. Melick, a transcript of which is contained in the record. The testimony heretofore quoted is taken from the case of State of Nebraska v. B. E. Johnson and F. W. Melick. It is true that Brittan did testify in that case that, had all the checks, including the three checks concerned in this suit, been presented on Saturday, they undoubtedly would have been paid, as he had no knowledge at that time that the draft would not have been honored as he expected.

Appellant further contends that this case comes within the well-established doctrine of estoppel *in pais;* that a person is held to a representation made or a position assumed, where otherwise inequitable consequences would result to another, who, having the right to do so under all the circumstances of the case, has in good faith relied thereon. It is equally well established, however, that, in order for a litigant to avail himself of an equitable estoppel, that estoppel must be pleaded and relied upon in the trial of the

case, and the plaintiff, having neglected to raise the question in the lower court, cannot now be heard on that issue here.

The facts in this case are very similar to those in the case of *Andrew v. Waterville Savings Bank*, 205 Ia. 888, except that in that case the draft was honored; but, before the checks issued against the credit given the depositor for the draft had been paid, the bank closed, and the receiver applied the proceeds of the draft on the note of the depositor held by the bank. In that case the court said: "Here, interveners' relationship to Hart was that merely of holder of Hart's checks, with no other agreement with him than that shown on the face of the check. The relationship between Hart and the bank was (1) that of drawer and holder of a draft, and (2) that of depositor to general checking account in the bank, with the mutual understanding that checks had been drawn and checks might be drawn, which, as presented, would be paid, with no agreement that the funds should be held for and used in the payment of particular checks—merely the common understanding that checks drawn and to be drawn should be paid. There was no trust. The deposit was a general one. Hart's are the rights of a general depositor. The interveners' rights are the rights of check holders only, not rights in the fund. See, further, *Andrew v. Marshalltown State Bank*, 204 Ia. 1190; *Border v. State Savings Bank*, 202 Ia. 27; *In re Security Savings Bank*, 211 N. W. (Ia.) 233 (not officially reported); *Leach v. State Bank of Redfield*, 212 N. W. (Ia.) 390 (not officially reported)."

The judgment of the trial court was correct and is

AFFIRMED.