**Senorino R. CRUZ, et al., Plaintiffs,**

v.

**U.S.A., et al., Defendants.**

**No. C–01–00892 CRB.**

United States District Court,
N.D. California.

Aug. 23, 2002.

Valeriano Saucedo, Miner, Barnhill & Galland, Visalia, CA, Paul A. Strauss, Miner, Barnhill & Galland, Chicago, IL, Morris J. Baller, Laura L. Ho, Debra A. Smith, Saperstein, Goldstein, Demchak & Baller, Oakland, CA, Matthew J. Piers, Jonathan A. Rothstein, Frederick S. Rhine, Gessler, Hughes & Socol, Ltd., Chicago, IL, for Plaintiffs.

Jean Lin, U.S. Dept. of Justice, Civil Division—Federal Programs Branch, Washington, DC, for U.S.

Raymond C. Marshall, Bingham McCutchen, LLP, San Francisco, CA, for Wells Fargo Bank.

Jonathan I. Blackman, Cristina M. Posa, Clearly, Gottlieb, Steen & Hamilton, New York City, for Banco De Mexico, S.A., Banco De Credito Rural, S.A., Estados Unidos Mexicanos, Banco National De

Credito Rural, SNC, and Patronato Del Ahorro Nacional.

## MEMORANDUM AND ORDER

BREYER, District Judge.

These cases were brought by individuals from Mexico, known as braceros, who worked in the United States during World War II and some period of time thereafter. While working in the United States, the braceros had a portion of their wages withheld. The withheld wages were deposited in a United States bank and then transferred to a Mexican bank. The withholdings were to be refunded when the braceros returned to Mexico. Plaintiffs allege that this money was never returned. They seek redress from the United States, Mexico, and Wells Fargo Bank. All defendants have moved this Court to dismiss the filed actions.

## BACKGROUND

With the outbreak of World War II, many American workers left their domestic jobs and joined the war effort. To address the resultant labor shortage, the United States looked to Mexico. On August 4, 1942 the United States and Mexico entered into the first in a series of agreements under which Mexican workers would come to work in United States. This first agreement covered agricultural workers.

The 1942 agreement between Mexico and the United States provided that the United States would enter a separate contract with each individual bracero. The United States then subcontracted the worker to the actual farmer or farmer association. Both the 1942 agreement between Mexico and the United States and the standard contract governing the relationship between each worker and the United States provided that ten percent of each worker's wages be retained and deposited into a Savings Fund. Upon proper application, the Savings Fund deductions were to be returned to the bracero when he returned to Mexico.

On April 26, 1943, the agreement between Mexico and the United States was amended. Under the amended agreement, the United States deposited the ten percent withholding into the Wells Fargo Bank account of the Bank of Mexico. The Bank of Mexico was then to forward the funds to the Mexican Agricultural Credit Bank, which was to return the funds to the agricultural braceros upon their return to Mexico.

By agreement between the United States and Mexico, all Savings Fund deductions were terminated on January 1, 1946. However, some braceros continued to work in the United States under the original agreements, as amended to exclude the Savings Fund and otherwise, through December 31, 1947.

With the problem of illegal immigration continuing unabated, in 1948 the United States and Mexico entered into another agreement. Notably, under this new agreement, each bracero entered into a contract directly with his employer in the United States. The United States was no longer a signatory to the individual work contract. Under this agreement, which was in effect from February 1948 through October 1948, the employer again withheld ten percent of each workers wages. However, the withheld wages were to be returned directly to the bracero in the form of a check upon termination of the work contract. The check was redeemable only when endorsed by the Immigration and Naturalization Service as the worker exited the United States on return to Mexico.

A new international agreement was again negotiated in 1949. Under its terms, the Mexican worker again contracted directly with his United States employer. Under this program, however, no savings deductions of any kind were authorized.

The last agreement between the United States and Mexico expired December 31, 1964.

The United States and Mexico also entered into a similar agreement to supply labor to the railroad industry in 1943. The agreement was identical in all material respects except that the Bank of Mexico was to forward the withheld wages to the Mexican National Savings Bank for return to the braceros. As with the agricultural program, all Savings Fund deductions were terminated as of January 1, 1946. The railroad braceros program terminated in early 1946 and was never revived.

## PROCEDURAL BACKGROUND

*Senorino Ramirez Cruz, et al. v. United States, et al.,* (No. 01–0892) was filed on March 2, 2001. The *Cruz* plaintiffs filed a Second Amended Complaint ("SAC") on July 12, 2001. The named defendants are Mexico, Banco de Mexico, Banco Nacional de Credito Rural, S.N.C., as successor in interest to the Banco de Credito Agricola, S.A. (collectively "Mexican Defendants"), the United States, and Wells Fargo Bank ("Wells Fargo").

On March 20, 2002, *De La Torre, et al. v. United States of America, et al.,* (No. 02–1942), *Chavez, et al. v. United States of America, et al.,* (No. 02–1943), and *Barba, et al. v. United States of America, et al.,* (No. 02–1944) were transferred to the Northern District of California from the U.S. District Court for the District of Columbia. On April 19, 2002, pursuant to Fed.R.Civ.P. 42(a), this Court consolidated the three transferred cases for purposes of discovery and motion practice.

While the consolidated complaints are nearly identical to the *Cruz* complaint, there are a few important differences. The consolidated complaints allege a class period continuing through 1964, whereas the *Cruz* class period terminates in 1949. They also name several federal government officials as additional defendants. Unlike *Cruz*, the consolidated complaints allege a cause of action under the Administrative Procedures Act ("APA"), 5 U.S.C. § 702, *et seq.*, against the United States and a violation of the Anti–Peonage Act, 42 U.S.C. § 1994, by the Mexican Defendants and Wells Fargo. Finally, unlike the *Cruz* complaint, the consolidated complaints do not allege a cause of action under California's unfair competition law.

Now before the Court are motions to dismiss filed by all defendants. The Court will discuss each motion in turn.

## DISCUSSION

### I. Mexican Defendants

The Mexican Defendants contend that they are immune from suit in the United States courts. The United States law of sovereign immunity has changed significantly since the events giving rise to this action occurred. Therefore, the first question presented by the Mexican Defendants' motion is which law of sovereign immunity should control.

As a result of judicial deference to the political branches, primarily the executive, foreign sovereigns enjoyed nearly complete immunity from suit in the United States prior to 1952.[1] *See Verlinden B.V.*

---

1. Plaintiffs claim that a foreign sovereign's expectation of immunity had eroded by the 1940s. In attempting to support this claim, plaintiffs rely on *Republic of Mexico v. Hoffman*, 324 U.S. 30, 65 S.Ct. 530, 89 L.Ed. 729 (1945), where the Supreme court rejected a claim of immunity made by Mexico. However, that case involved an *in rem* action against a steamship that was owned but neither possessed by, nor in service of, the Republic of Mexico. The Supreme Court concluded that Mexico was not entitled to immunity, especially since the executive branch had declined to recommend immunity, both in that particular case and in other similar cases.

*v. Central Bank of Nigeria,* 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). In 1952, the State Department replaced absolute sovereign immunity with a policy of restricted sovereign immunity as set forth in the Tate Letter. *Id.* Twenty-four years later, this restrictive theory of sovereign immunity was codified as the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602–1611 ("FSIA").

The operative events in these cases occurred before 1952. As a result, the Mexican Defendants claim that they are entitled to the absolute sovereign immunity enjoyed by foreign states prior to the Tate Letter and that these cases must be dismissed for lack of subject matter jurisdiction. Plaintiffs respond that the FSIA applies retroactively to events occurring prior to 1952 and that this Court has subject matter jurisdiction under the terms of the FSIA.[2] The question, then, is whether the FSIA applies.

The starting point for retroactivity analysis is *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). In that case, the Supreme Court held that provisions of the Civil Rights Act of 1991 providing for compensatory and punitive damages, and the right to a jury trial, did not apply to a Title VII case pending on appeal. *Id.*

In *Landgraf,* the Court made clear that "the presumption against retroactive legislation is deeply rooted in our jurisprudence." *Id.* at 265, 114 S.Ct. 1483. With regard to civil laws, this presumption against retroactivity can be overcome only by an express statutory command that the law should be given retroactive effect. *Id.* at 280, 114 S.Ct. 1483. The Court also made clear, however, that a "statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment." *Id.* at 269, 114 S.Ct. 1483. Instead, a statute only operates retroactively where it "attaches new legal consequences to events completed before its enactment." *Id.* at 270, 114 S.Ct. 1483.

As stated by the Court:

When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Id.* at 280, 114 S.Ct. 1483.

Because these cases implicate the FSIA, a statute enacted after the events in this suit, *Landgraf* teaches that the first task for the Court is to examine whether the

---

*Hoffman* cannot credibly be characterized as an exception to the pre–1952 general rule of absolute sovereign immunity. *Hoffman* is much more readily characterized as delineating the outer boundary of that general rule—a boundary which the current case fits easily within. In short, the fact that an *in rem* action against a boat that was owned, but not possessed by, or in service of, a foreign sovereign, was permitted to proceed could not have diminished Mexico's reasonable expectation that it was immune from all suit in United States courts.

**2.** Specifically, plaintiffs contend that the activities of the Mexican Defendants fall within the commercial activity exception to sovereign immunity under the FSIA.

FSIA contains a clear expression of statutory intent regarding its proper reach.

The FSIA states that: "Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter." 28 U.S.C. § 1602. At first glance, the language "should henceforth" suggests prospective application only. However, the language of prospectivity speaks in relation to the actual making of a claim of immunity, not in relation to the underlying events giving rise to a cause of action, suggesting, perhaps, that the FSIA should apply to all claims of immunity made after 1976, regardless of the time-frame in which the events giving rise to the action occurred.

The District of Columbia Circuit concluded that as a result of clearly expressed statutory intent the FSIA should be given retroactive effect. *See Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1170 (D.C.Cir.1994). However, other courts have reached the opposite conclusion. *See, e.g., Carl Marks & Co., Inc. v. Union of Soviet Socialist Republics*, 841 F.2d 26, 27 (2nd Cir.1988); *Jackson v. People's Republic of China*, 794 F.2d 1490, 1497 (11th Cir.1986) (stating agreement with lower court's conclusion that the "FSIA does not contain a clear and unequivocal statement that it was intended to apply retroactively to transactions which predated 1952. Quite to the contrary, the language of the Act is expressly prospective.") *Jackson v. People's Republic of China*, 596 F.Supp. 386, 388 (N.D.Ala.1984). The fact of this disagreement among the courts suggests that the statutory language of the FSIA is ambiguous.

Further evidence of ambiguity is provided by the fact that Congress provided a grace period before the act was to take effect. The statute provided: "This Act shall take effect ninety days after the date of its enactment." Foreign Sovereign Immunities Act of 1976, Pub.L. No. 94–583, § 8, 90 Stat. 2898 (1976). Arguably this grace period was designed to "give adequate notice to foreign nations of the United States' new policy of restrictive immunity." *Jackson*, 596 F.Supp. at 388. However, the statutory language and legislative history do not reveal whether this was the primary purpose of the grace period. Indeed, a grace period may have been provided to further the relative simple purposes of administrative and judicial efficiency.

Still more ambiguity is provided by the legislative context surrounding enactment of the FSIA. The restrictive theory of sovereign immunity became the policy of the United States with adoption of the Tate Letter in 1952. The policy of the Tate Letter was not "enacted into law, however, and its application proved troublesome." *Verlinden*, 461 U.S. at 487, 103 S.Ct. 1962. These troubles stemmed from the inconsistent application of the policy. Post–1952, a foreign sovereign sued in a United States court would typically make a request of immunity to the State Department. Inconsistencies stemmed from two factors. First, sometimes "political considerations led to suggestions of immunity" not otherwise appropriate under the restrictive theory. *Id.* Second, some sovereigns failed to make a request, forcing courts to adjudicate immunity based on prior State Department decisions. *Id.* As a result of these distortions, "governing standards were neither clear nor uniformly applied." *Id.* at 488, 103 S.Ct. 1962. The FSIA was born out of Congress's dissatisfaction with this state of affairs. The FSIA was passed to bring uniformity, consistency, and fairness to immunity determinations. *Id.*

Against this backdrop, it is clear that the purpose of the FSIA was to codify and

rationalize a policy—restrict sovereign immunity—which had been in place for twenty-four years, since 1952. The purpose, absent an unequivocal expression to the contrary, was not to change law that was then twenty-four years old. The purpose was to codify the theory of restrictive sovereign immunity, without altering the "substantive law [of] liability." *First Nat. City Bank v. Banco Para El Comercio Exterior De Cuba,* 462 U.S. 611, 620, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983). Indeed, nothing in the history of the FSIA suggests that Congress considered the applicability of the FSIA to cases which arose prior to 1952—twenty-four years in the past.

Had Congress desired that the FSIA apply to claims arising prior to 1952, it could have easily adopted language to that affect. Had Congress intended that the FSIA apply to claims arising prior to 1952, it could have provided that: "Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter, *regardless of the date that the events giving rise to the cause of action occurred.*" Congress did not so provide. Given the ambiguities discussed above, the Court finds that the FSIA does not contain a clear expression of statutory intent in favor of application to events occurring before 1952.

As *Landgraf* dictates, then, the second step is to determine whether application of the FSIA to the case at bar would be truly retroactive. That is, would application of the FSIA attach "new legal consequences" to past actions? *Landgraf,* 511 U.S. at 270, 114 S.Ct. 1483. Answering this question with regard to jurisdictional statutes has resulted in some confusion stemming from the different types of jurisdictional statutes. This confusion was largely laid to rest in *Hughes Aircraft Co. v. U.S. ex rel. Schumer,* 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997) where the Supreme Court distinguished between jurisdictional statutes that affect only the availability of certain fora and jurisdictional statutes which control whether certain disputes can be adjudicated at all.

> Statutes merely addressing which court shall have jurisdiction to entertain a particular cause of action can fairly be said merely to regulate the secondary conduct of litigation and not the underlying primary conduct of the parties. (citation omitted). Such statutes affect only where a suit may be brought, not whether it may be brought at all.... [Other statutes] create[ ] jurisdiction where none previously existed.... Such a statute[s], even though phrased in "jurisdictional" terms, is as much subject to our presumption against retroactivity as any other.

*Id.* at 951, 117 S.Ct. 1871.

Given this dichotomy, the FSIA is clearly a statute which would operate "retroactively" if given effect in this case. If the FSIA is applied to pre–1952 events, some suits against sovereign may be brought that otherwise would have been barred.[3] It is too much to argue that application of the FSIA to this case would merely mean that the Mexican Defendants could be sued here in the United States as well as in Mexico.[4] Rather, application of the FSIA to the case at bar would affect not "only

---

**3.** This is true, of course, only if the suit fits within an exception to sovereign immunity recognized by the FSIA.

**4.** Further, to the extent that substantive law of liability is different in the United States and Mexico, "new legal consequences" could attach to past actions if a United States forum is made available.

where a suit may be brought," but rather "whether it may be brought at all." *Id.*

Admittedly, some courts express the opposite view in dicta. In *Creighton Ltd. v. Government of State of Qatar*, 181 F.3d 118, 123 (D.C.Cir.1999), the court suggested that "application of 1976 version of FSIA to acts committed before 1952 would not be retroactive because it 'would not alter Germany's liability under the applicable substantive law in force at the time, i.e. it would just remove the bar of sovereign immunity to the plaintiff's vindicating his rights under that law.'" (quoting *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1170 (D.C.Cir.1994)) In this Court's opinion, it is difficult to conceive of a law that would "alter" liability more than one affecting whether a sovereign can be made to answer in a court of law at all.

This conclusion is consistent with the overall intent of the FSIA. As the Supreme Court has stated: "The language and history of the FSIA clearly establish that the Act was not intended to affect the substantive law determining the liability of a foreign state or instrumentality...." *First Nat. City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611, 620, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983). It is difficult to imagine what could be more substantive than a sovereign's expectation of absolute immunity. Indeed, it is clear that the intent of the FSIA was to codify a policy—the restrictive theory of sovereign immunity—adopted twenty-four years earlier in 1952, not to change pre-1952 law.

■ Because the legislative language regarding the proper scope of the FSIA is ambiguous and the application of the FSIA to events occurring before 1952 would have impermissible retroactive effect, the Court concludes that the FSIA is not applicable to any claims arising prior to 1952. Instead, the Mexican Defendants are absolutely immune to any claims that arose prior to 1952.[5]

This leaves the question of whether any of the claims pled against the Mexican Defendants arose after 1952. Most of the named plaintiffs terminated their employment under the braceros program prior to 1952. However, in the four complaints before the Court, some of the named plaintiffs allege that they worked under the braceros program past 1952. For example, the *Cruz* complaint alleges that Liborio Santiago Perez "was employed as an agricultural laborer under the bracero program from 1942 to 1962." SAC ¶ 12.

Given the undisputed terms of the bracero program, however, it is clear that any cause of action against the Mexican Defendants arose and ripened prior to 1952.[6]

**5.** Having reached this conclusion, the Court does not address the other defenses raised by the Mexican Defendants. The Court notes, however, that these defenses raise serious questions. First, even if the FSIA were given retroactive effect, there is a question whether this case would fall within the commercial activity exception to sovereign immunity under the FSIA. The Act of State Doctrine also presents unique questions. Finally, there is a very real possibility that plaintiffs' claims are time-barred.

**6.** Because this motion to dismiss is jurisdictional, and therefore brought pursuant to Rule 12(b)(1), the Court is not required to accept all of plaintiff's factual allegations as true. Instead, the party moving under Rule 12(b)(1) may submit evidence indicating that the court lacks subject matter jurisdiction. "It then becomes necessary for the party opposing the motion to present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction." *Association of Am. Med. Colleges v. United States*, 217 F.3d 770, 778 (9th Cir.2000) (noting that a district court "obviously does not abuse its discretion by looking to this extra-pleading material in deciding the issue, even if it becomes necessary to resolve factual disputes").

The standard bracero contract contemplated that the individual worker would apply for return of his Savings Fund deductions upon return to Mexico. Bracero contract ¶ 5. Accordingly, an argument can be made that a bracero had no claim against Mexico until he returned to Mexico. But it is also clear under the standard contract that upon expiration of the contract, the bracero had a legal obligation to return to Mexico (albeit at the expense of the United States). *Id.* ¶ 25.

By December 31, 1947 all agricultural braceros had been repatriated to Mexico or their contracts had been terminated and they were in the United States illegally. *See* Memo from Wilson R. Buie to William A. Anglim, PMA, USDA, "Final Report on Activities of Foreign Farm Labor Program," Jan. 30, 1948, ¶ 3. In all subsequent agreements between the United States and Mexico, Mexico was to play no role in return of the Savings Fund deductions. In fact, no Savings Fund deductions, of any kind, were authorized after October of 1948. With regard to the railroad braceros, that program was fully terminated by 1946. Therefore, any cause of action against the Mexican Defendants arose prior to 1952.

Accordingly, the Mexican Defendants' motion to dismiss is hereby GRANTED.[7]

## II. Wells Fargo

Plaintiffs allege several distinct cause of action against Wells Fargo. The Court addresses each in turn.

### A. Breach of Contract

Plaintiffs allege breach of contract theories against Wells Fargo arising out of two separate sets of contracts.

---

7. After oral argument, the plaintiffs submitted a letter brief on the issue of sovereign immunity. The first part of the letter brief merely restated arguments that had already been exhaustively briefed and argued. The second part claims that the Edge Act, 12 U.S.C. § 632, confers jurisdiction over the Mexican Defendants. Despite the fact that plaintiffs had failed to raise, or even mention, this argument previously, the Court addresses it now.

The Edge Act creates federal question jurisdiction in any case involving a United States corporation that arises "out of transactions involving international or foreign banking." 12 U.S.C. § 632. But while the Act created a new category of federal question jurisdiction, it did not affect the law of sovereign immunity. Indeed, the cases cited by plaintiffs do not discuss sovereign immunity—presumably because the cases were brought by a foreign sovereign.

That the Edge Act did not abrogate foreign sovereign immunity is implicit in the analysis of *National City Bank of New York v. Republic of China*, 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389 (1955). In that case, brought under the Edge Act, the Republic of China sued to recover deposits made in the defendant bank. The bank counterclaimed. The trial court granted a motion to dismiss the counterclaims on the basis of sovereign immunity. *See Republic of China v. National City Bank of New York*, 108 F.Supp. 766 (S.D.N.Y.1952). The appellate court affirmed because the counterclaims "were not based on the subject matter of the suit." *Republic of China v. National City Bank of New York*, 208 F.2d 627, 629 (1953). The Supreme Court reversed, concluding that the counterclaims were "based on the same subject matter" and therefore the Republic of China had waived its sovereign immunity by bringing suit. *National City Bank of New York v. Republic of China*, 348 U.S. 356, 365, 75 S.Ct. 423, 99 L.Ed. 389 (1955). If the Edge Act had somehow abrogated the sovereign immunity of the Republic of China, none of this analysis would have been necessary. The relatedness of the counterclaims would have been immaterial. Likewise the fact that the Republic of China was the original plaintiff in the action would not have mattered. Both factors were crucial, however. The Supreme Court permitted the counterclaim against the Republic of China because notions of "fair dealing" permitted the particular counterclaim. *Id.*

In short, the Edge Act has no bearing the near absolute immunity from suit that foreign sovereigns enjoyed prior to 1952.

### 1. Agreements between Wells Fargo and United States and Wells Fargo and Mexico

Plaintiffs allege that Wells Fargo entered "contracts with the United States and Mexico." SAC ¶ 104. The complaint further alleges that Wells Fargo failed to "promptly deposit all relevant monies received from the United States into the account of Banco de Mexico" and/or failed to "furnish the Banco de Mexico with documentation" regarding the withholdings, thereby breaching its contractual obligation. SAC ¶ 108–9.

Plaintiffs do not contend that they are signatories to any contract with Wells Fargo. Therefore, they have no direct cause of action. Plaintiffs maintain, however, that they can bring this cause of action for breach because they are intended third-party beneficiaries of the contracts.

■ Under general California law: "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." Cal.Civ.Code § 1559. However, third-party's do not have a cause of action for breach of a contract that a bank enters into with a depositor or borrower. *See Atlantic Cement Co., Inc. v. South Shore Bank,* 730 F.2d 831, 833 (1st Cir.1984).

The central fact here is that contracts arising in the context of a banking relationship—specifically the bank-depositor relationship—are far removed from the typical context where a third-party can maintain a cause of action for breach. Banking is a unique contractual relationship. Banking agreements are always means to an end rather than an end in themselves. That is, except in extraordinary circumstances, funds deposited in a bank will ultimately benefit a third-party. The courts have understood this unique context and have refused to recognize third-party standing for breach of a typical banking contract.

For example, the payee of a check has no cause of action against a bank if the bank violates an obligation to the writer of the check. *Id.* This is true under the Uniform Commercial Code and the common law. *See id.* This is so even where the depositor writes a check with the explicit intent to benefit a third-party (as is normally the case) and the bank has knowledge of that intent. In barring such a cause of action, the law recognizes that the bank/depositor relationship is entered for the sole benefit of the depositor, not third-parties.

■ Plaintiffs have cited no authority for recognizing third-party beneficiary status in the banking context. Nor have they cited any authority where third-party beneficiary status has been upheld in an analogous context. Given the unique context of the banking relationship, the Court refuses to undertake traditional third-party beneficiary analysis. Plaintiffs have no cause of action for breach of any contract that Wells Fargo may have entered with the United States or Mexico.

### 2. Agreement between United States and Mexico

■ Plaintiffs second theory of contractual liability is based on the umbrella agreements between Mexico and the United States. In executing these agreements, the complaint alleges that Wells Fargo acted as an agent for the United States and Mexico and can therefore be held liable under a contract theory. However, it is a matter of basic California contract law that where his principal is disclosed an agent cannot be held liable for breach of a contract to which he is not a party. *See Filippo Industries, Inc. v. Sun Ins. Co. of New York,* 74 Cal.App.4th 1429, 1443, 88 Cal.Rptr.2d 881 (1999).

Plaintiffs have offered no authority which would permit departing from this general principle here.

### 3. Conclusion

Accordingly, plaintiffs' breach of contract claims against Wells Fargo are hereby DISMISSED.

### B. Fiduciary Duty

■ Plaintiffs allege they are the beneficiaries of a fiduciary relationship with Wells Fargo. The existence of a fiduciary duty is generally a question of fact which cannot be resolved at the motion to dismiss stage. *See Michelson v. Hamada,* 29 Cal.App.4th 1566, 1576, 36 Cal.Rptr.2d 343 (1994). However, plaintiffs have not pled facts that would give rise to a fiduciary relationship, and the Court need not accept their conclusory allegation that such a relationship existed.

■ It is undisputed that "banks, in general ... are not fiduciaries for their depositors." *Copesky v. Superior Court,* 229 Cal.App.3d 678, 694, 280 Cal.Rptr. 338 (1991). In this case, the plaintiffs are not even depositors, suggesting that *a fortiori* no fiduciary relationship existed between plaintiffs and Wells Fargo. Indeed, plaintiffs had no formal relationship whatsoever with Wells Fargo.

■ Under California law, the existence of a fiduciary relationship is determined by reference to the five factors laid out in *Wallis v. Superior Court,* 160 Cal.App.3d 1109, 207 Cal.Rptr. 123 (1984). Those factors are "(1) inherently unequal bargaining positions; (2) nonprofit motivation, i.e., objective of securing peace of mind, security; (3) inadequacy of ordinary contract damages; (4) special vulnerability of one party to harm as a result of breach of trust of the other; and (5) awareness by the other of this special vulnerability." *Copesky,* 229 Cal.App.3d at 687 n. 7, 280 Cal.Rptr. 338.

These factors were applied to the account holder-bank relationship in *Copesky.* The court not only held that this relationship did not give rise to a fiduciary duty, it held that it was not a "special relationship" which would support tort remedies for breach of an implied covenant of good faith and fair dealing. *Copesky* went so far as to conclude that only in the context of insurance contracts is there a presumption that any tort remedies are available for breach. *Copesky,* 229 Cal.App.3d at 690, 280 Cal.Rptr. 338.

The context in which the *Wallis* factors were applied in *Copesky* highlights an important threshold issue regarding fiduciary duties. Namely, certain predicate facts, regarding the basic relationship between two parties, need to be established before resort to the *Wallis* factors is appropriate. In *Copesky,* the *Wallis* factors were used to determine whether contracting parties shared a "special relationship" such that breach of the an implied covenant of good faith and fair dealing (an implied term of the contract) could give rise to a tort cause of action. That is, the predicate to application of the *Wallis* factors was that the parties shared an underlying contractual relationship.

Some courts have applied the *Wallis* factors, and thereby undertaken a factual inquiry in determining whether a fiduciary relationship existed, based on the relationship between a bank and depositor or bank and borrower. *See e.g., Kim v. Sumitomo Bank,* 17 Cal.App.4th 974, 21 Cal.Rptr.2d 834 (rejecting the existence of a fiduciary relationship between a bank and borrower). Of course, the bank-depositor and bank-borrower relationships are grounded in contract law.

■ Here there is no contract forming the basis of a relationship between plaintiffs and Wells Fargo. The plaintiffs have cited no case, and the Court has found

none, where a court undertook examination of the *Wallis* factors in the banking context where the bank and the alleged beneficiary of a fiduciary duty did not share even a contractual relationship. The Court concludes that where, as here, there is no relationship between plaintiff and defendant bank, contractual or otherwise, reference to the *Wallis* factors is inappropriate. In short, the facts as pled, even if fully accepted, do not give rise to a fiduciary relationship.

Accordingly, the breach of fiduciary duty claim against Wells Fargo is hereby DISMISSED.

### C. Resulting Trust

Plaintiffs allege a claim for a resulting trust. "A resulting trust arises by operation of law to enforce the inferred intention of the parties to the transaction. The existence of a resulting trust is established by circumstances showing that the transferee was never intended to take beneficial interest through the transaction. Once the trust is declared, the remedy is delivery of the res by the trustee to the beneficiary." *In re Markair, Inc.*, 172 B.R. 638, 641–42 (9th Cir. BAP 1994).

Here plaintiffs have alleged that the United States was responsible for transferring funds to Wells Fargo, that Wells Fargo was never intended to take a beneficial interest in the transferred funds, and that Wells Fargo was to transfer those funds for the ultimate interest of plaintiffs. SAC ¶¶ 119–21. The complaint further alleges that Wells Fargo failed to transfer the funds. *Id.* ¶ 122. The complaint however, does not allege, nor could it, that Wells Fargo was meant to hold the funds in trust for the plaintiffs. Without such an intent, plaintiffs cause of action for a resulting trust fails.

"A resulting trust is often called an 'intention-enforcing' trust. It arises by implication of law (§ 853) to enforce the inferred intent of the parties to a transaction." *Calistoga Civic Club v. City of Calistoga*, 143 Cal.App.3d 111, 117, 191 Cal.Rptr. 571 (1983). The complaint does not allege that either the United States or Wells Fargo anticipated that Wells Fargo would hold any funds in trust for the benefit of plaintiffs. On the contrary, as alleged, Wells Fargo was merely a conduit to facilitate the transfer of funds from the United States to Mexico. Wells Fargo never even had responsibility for affirmatively transferring funds, much less for holding them in trust. Wells Fargo was merely to accept deposits from the United States into the account of the Bank of Mexico—in no way were they to be held in trust for plaintiffs. *Id.* at 33.

The cause of action for a resulting trust is hereby DISMISSED.

### D. Accounting

Plaintiffs allege that they are entitled to an accounting from Wells Fargo. An accounting cause of action is an equitable claim. It sounds only where the underlying action and accounts are so complicated that a normal action for a fixed sum is not practical. *See Civic Western Corp. v. Zila Industries, Inc.*, 66 Cal.App.3d 1, 14, 135 Cal.Rptr. 915 (1977).[8]

At the motion to dismiss stage, the Court accepts that the accounts underlying this action are complicated, if only as a result of the passage of time, to an extent that an action for a fixed sum would be impractical. Therefore a cause of action may lie against Wells Fargo. But a serious question remains as to whether this

---

**8.** The existence of a fiduciary relationship between plaintiffs and Wells Fargo would also give rise to a cause of action for accounting.

As stated above, however, no such relationship exists.

cause of action can be maintained by these plaintiffs.

As stated by Witkin, an element of the cause of action is: "A balance due from defendant to the plaintiff that can only be ascertained by an accounting." 5 Witkin, California Procedure 4th, Pleading § 776. The classic accounting action entails circumstances under which defendant owes plaintiff money, but plaintiff does not know how much, and it would be unreasonable for plaintiff to plead a specific dollar amount. However, in this case, plaintiffs do not allege that they are due any balance from Wells Fargo. Any direct obligation that Wells Fargo may have is to the Bank of Mexico.

Plaintiffs cite only one authority in support of their argument that they are proper parties to bring an accounting action against Wells Fargo—the Restatement of Restitution. According to the Restatement, "A person who, acting or purporting to act on account of another, has received property from a third person for the other, is under a duty to account to the other for such property." Restatement of Restitution § 124.

Because Wells Fargo did not act, or purported to act, on behalf of plaintiffs, this section of the Restatement does not help plaintiffs. As stated by the comment, "this Section applies most frequently to persons who are fiduciaries and as such receive property on account of others," because fiduciaries act on behalf of others. *Id.* No such relationship exists here.

The comment goes on to note that:

The rule stated in this Section applies also to persons who without being fiduciaries receive property on account of another.... Thus, if a person purports to be an agent, and as such receives title to or possession of property on account of a purported principal, the latter is entitled to ratify the receipt of such property, and if he does so, the purport-

ed agent is subject to the same duty of accounting as if he had been authorized.... Similar rules apply to the receipt of property by one purporting to be a guardian or a trustee.

*Id.* That is, this rule may apply to non-fiduciary relationships, but only where they bear some semblance to a classic fiduciary relationship. The bottom line here is that Wells Fargo never purported to act in any way on behalf of the braceros. Wells Fargo merely accepted deposits into the account of the Bank of Mexico, as it would have done for any account holder.

The Court is aware of no other authority, and plaintiffs have cited none, that might warrant permitting plaintiffs to maintain an accounting action against Wells Fargo. Accordingly, the motion to dismiss this cause of action is GRANTED.

Of course, the fact that Wells Fargo is not liable to plaintiffs for an accounting does not in any way imply that Wells Fargo is not fully amenable to third-party subpoenas for the production of the relevant documents in this case.

### E. Unjust Enrichment

Plaintiffs allege a cause of action for unjust enrichment against Wells Fargo. But again, the same problem, regarding whether plaintiffs are the proper party to bring this claim, presents itself here. It is black letter law that a person unjustly enriched can be required to pay restitution under the law. However, unjust enrichment involves a benefit conferred on defendant by plaintiff.

In this case, plaintiffs conferred no benefit upon Wells Fargo. Wells Fargo was merely an intermediary to a transaction between Mexico and the United States. Plaintiffs are not the proper party to bring this suit.

■ Even if plaintiffs were the proper party to bring this suit, an element of an unjust enrichment claim has not been pled. To prevail in an unjust enrichment claim, a plaintiff must show that "the acquisition of the property was wrongful." *Calistoga Civic Club v. City of Calistoga,* 143 Cal. App.3d 111, 116, 191 Cal.Rptr. 571 (1983). Plaintiffs do not allege that Wells Fargo's initial acquisition, through the deposit by the United States into the account of the Bank of Mexico, was in any way wrongful.

The cause of action for unjust enrichment against Wells Fargo is hereby DISMISSED.

### F. Conversion

■ Plaintiffs allege that Wells Fargo is liable for conversion. However, a party can maintain a conversion claim only for property it owns at the time of the alleged conversion. *In re Bartoni–Corsi Produce, Inc.,* 130 F.3d 857, 860 (9th Cir.1997). Plaintiffs did not own the funds deposited with Wells Fargo, the United States government did.

To counter this argument, plaintiffs claim that they have an equitable ownership interest in the funds that were deposited that gives them standing to sue for conversion. The cases that plaintiffs cite in support of this proposition are inapposite. For example in *McCafferty v. Gilbank,* 249 Cal.App.2d 569, 572, 57 Cal. Rptr. 695 (1967) plaintiff was permitted to bring a conversion action because he held an equitable lien on the allegedly converted property. An equitable lien represents a direct ownership interest.

Plaintiffs have cited no case suggesting that a third-party can have an equitable interest in a bank deposit. As discussed more fully above, bank deposits present an entirely unique situation. For all of the reasons that third-party beneficiary theories of liability have been rejected in the banking context, the Court rejects plaintiffs' argument that they had an equitable interest in the deposits made by the United States into the account of the Bank of Mexico at Wells Fargo.

■ Even if plaintiffs had an equitable interest in the deposits, this cause of action would not be saved. Because title to a deposit passes immediately to the bank upon deposit, a depositor has no conversion claim against a bank under California law. *See Morse v. Crocker National Bank,* 142 Cal.App.3d 228, 232, 190 Cal. Rptr. 839 (1983).

An exception to this general rule applies in the case of special deposits. In the case of a special deposit (typically those which are not commingled), as opposed to a general deposit, a bank may assume the role of trustee over deposited funds while title remains with the "depositor." In the case of a special deposit, a cause of action lies for conversion.

■ Plaintiffs have not pled the existence of a special deposit. The fact that the depositor has a specific reason for making a deposit, which is communicated to the bank, does not alone create a special deposit. *See Cabrera v. Thannhauser & Co.,* 183 Cal. 604, 609, 192 P. 45 (1920). Rather, to create special deposit "the depositor must, at the time of making the deposit, specify that the funds are to be kept apart from other moneys of the depositary and devoted only to the payment of the depositor's debt." *Id.*

The allegations of the complaint do not meet this standard. The complaint alleges, quite simply, that the United States deposited money into the Bank of Mexico account at Wells Fargo. SAC ¶ 33. Because such a deposit constitutes a general deposit, there can be no action for conversion.

The cause of action for conversion against Wells Fargo is hereby DISMISSED.

## G. Unfair Business Practice

The complaint alleges that Wells Fargo violated California's Unfair Business Practice law. Wells Fargo counters that this action should be dismissed because, as a matter of law, plaintiffs are not entitled to either form of relief available under California's Unfair Business Practices law, restitutionary and injunctive. *See MAI Systems Corp. v. UIPS,* 856 F.Supp. 538, 541 (N.D.Cal.1994). The Court agrees.

The California statute states:

Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

Cal.Bus. & Prof.Code § 17203.

First, plaintiffs are not entitled to restitution because they are not "person[s] in interest." *Id.* As discussed in detail above, plaintiffs, have no real interest in the deposits made by the United States into the Bank of Mexico account at Wells Fargo. Again, restitution is implicated where the defendant wrongfully obtains something which the plaintiff had at least an equitable right to keep. *See Day v. AT & T Corp.,* 63 Cal.App.4th 325, 340, 74 Cal.Rptr.2d 55 (1998). Wells Fargo did not wrongly obtain The Savings Fund deductions and plaintiff had no right to prevent their deposit at Wells Fargo.

Second, as a matter of law, plaintiffs are not entitled to injunctive relief in this case. "The injunctive remedy should not be exercised 'in the absence of any evidence that the acts are likely to be repeated in the future.'" *Cisneros v. U.D. Registry, Inc.,* 39 Cal.App.4th 548, 574, 46 Cal.Rptr.2d 233 (1995) (quoting *Mallon v. City of Long Beach,* 164 Cal.App.2d 178, 190, 330 P.2d 423 (1958)). The complaint does not alleged, nor could it, that there is any danger that Wells Fargo might repeat past allegedly illegal acts.

## H. Anti-Peonage Act

The *De La Torre, Barba,* and *Chavez* complaints allege a violation of the Anti-Peonage Act, 42 U.S.C. § 1994. Peonage is a "condition of compulsory service, based upon indebtedness of the peon to the master." *United States v. Reynolds,* 235 U.S. 133, 144, 35 S.Ct. 86, 59 L.Ed. 162, (1914); *Clyatt v. United States,* 197 U.S. 207, 215, 25 S.Ct. 429, 49 L.Ed. 726 (1905). To state a claim under the Anti-Peonage Act, plaintiff must show indebtedness and compulsion. *See Dolla v. Unicast Co.,* 930 F.Supp. 202, 205 (E.D.Pa. 1996).

Plaintiffs do not claim that they were compelled by indebtedness to work for Wells Fargo. Instead, plaintiffs claim that Wells Fargo had an affirmative duty to protect them from the exploitation they suffered at the hands of their employers. Specifically, plaintiffs argue:

By failing to inform the braceros as to the whereabout of their wages, the amounts they had in savings, the amounts they were entitled to be earning, and what they did and did not have to pay for as well as by failing to properly inspect and regulate bracero camps, the defendants allowed the abuse to con-

tinue and metastasize while financially benefitting from such exploitation. Opposition 14–15.

■ Plaintiffs have cited absolutely no authority to support their position that a party can be liable under the Anti–Peonage Act for a failure to protect individuals from a state of peonage imposed by others. Furthermore, even if such a legal theory were viable, Wells Fargo had no duty to protect plaintiffs. As discussed above, there was no relationship, fiduciary or otherwise, between the braceros and Wells Fargo.

The cause of action for violation of the Anti–Peonage Act against Wells Fargo is hereby DISMISSED.

### III. United States Defendants

Plaintiffs have alleged a breach of contract claim against the United States under the "Little" Tucker Act, 28 U.S.C. § 1346(a)(2). The claim is based on breach of the express contract that each bracero signed with the United States. The United States concedes that, if timely, this would be a cognizable claim because the United States has waived its sovereign immunity under the "Little" Tucker Act. The United States maintains, however, that this claim is now time-barred under the applicable six-year statute of limitations. *See* 28 U.S.C. § 2401(a); *Bray v. United States*, 785 F.2d 989, 990 (Fed.Cir. 1986).

### A. Legal Standard

■ In suits against the federal government, the statute of limitations is a jurisdictional issue because the United States has not waived its sovereign immu-

nity to stale claims. As stated by the Ninth Circuit:

> The doctrine of sovereign immunity precludes suit against the United States without the consent of Congress; the terms of its consent define the extent of the court's jurisdiction. The applicable statute of limitations is a term of consent. The plaintiff's failure to sue within the period of limitations is not simply a waivable defense; it deprives the court of jurisdiction to entertain the action.

*Sisseton–Wahpeton Sioux Tribe, of Lake Traverse Indian Reservation, North Dakota and South Dakota v. United States*, 895 F.2d 588, 592 (9th Cir.1990). Accordingly, this issue is appropriately considered pursuant to Fed.R.Civ.P. 12(b)(1) and the Court may resolve factual discrepancies where necessary.[9]

### B. Equitable Tolling

■ Plaintiffs claim that their claims are not time-barred because the statute of limitations has been equitably tolled. Under federal law, a cause of action generally accrues when "the plaintiff knows, or in the exercise of reasonable diligence should know, of both the injury and its cause." *Alvarez–Machain v. United States*, 107 F.3d 696, 700 (9th Cir.1997). Accordingly, a cause of action is equitably tolled where the plaintiff does not know, and has no reason to know, of his injury and its cause.

■ In the context of a fiduciary relationship, principles of equitable tolling are more liberally applied, because the beneficiary of a fiduciary relationship has a lessened duty to discover a cause of action against his fiduciary. *See Loudner v.*

---

9. In fact, given the posture of this case, the plaintiff bears the burden of proving that this Court has jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) ("Federal courts are courts of limited

jurisdiction.... It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction.") (citations omitted).

*United States,* 108 F.3d 896, 901 (8th Cir. 1997). The courts have not articulated a distinct standard for equitable tolling where a fiduciary or trust relationship exists; rather they have found that a beneficiary of a trust or fiduciary relationship has a "somewhat lessened" duty to discover legal claims against the trustee. *Id.* Accordingly, the Court must determine whether the braceros and the United States government shared a fiduciary relationship, as alleged, in order to more precisely define the standard for equitable tolling.

In support of the argument that the United States owes them a fiduciary duty, plaintiffs place significant reliance on *Loudner,* which confirmed a long line of case law holding that the United States owes a fiduciary duty to Indian tribes. *Id.* at 900–01.

The relationship between the braceros and the United States, however, is nothing like the relationship between the United States and Indian Tribes. Indeed, "there is nothing in the relationship between the United States and any other persons . . . that is legally comparable to the unique relationship between the United States and Indian Tribes." *Cato v. United States,* 70 F.3d 1103, 1108 (9th Cir.1995). Outside the context of Indian tribes, the Court is aware of no case where the United States was found to owe a fiduciary duty based on contractual obligations.[10]

█ The imposition of a fiduciary duty in this case is not supported by either an explicit statement of governmental intent or a unique history of a trust-like relations. Accordingly, the United States does not owe plaintiffs a fiduciary duty. The plaintiffs' duty to discover their cause of action against the United States is not "lessened," and will be adjudged under the basic law of equitable tolling.

The parties expend considerable effort contesting the factual circumstances of the braceros and the braceros program as they relate to equitable tolling. The United States points out the each bracero received a copy of the work contract in Spanish and had the contract orally explained. The plaintiffs respond that the braceros were illiterate and unsophisticated and as a result remained ignorant of the mechanics of the Savings Fund. At some point the Court may have to undertake such an individualized factual inquiry. It need not do so now.

The facts, as pled, preclude a finding that the statute of limitations should be equitably tolled. The *Cruz* plaintiffs, in their opposition brief, write that "the SAC (¶¶ 50–52), *indicates* that plaintiffs did not know that money had been deducted from their paychecks. . . ." Opposition at 66 (emphasis added). In fact, the complaint indicates just the opposite. The complaint alleges that plaintiffs did not know "the *amount* of money deducted from their wages." SAC ¶ 51 (emphasis added). This language implies that plaintiffs did, in fact, know that some money was being deducted, just not how much. The other complaints also fail to allege that the braceros were ignorant of the fact that a portion of their wages was being withheld.

In short, the complaints allege that the braceros knew that a portion of their

---

10. The existence of a fiduciary relationship has been rejected even where the relationship between the United States and the alleged beneficiary of the relationship was more substantial than it is here. *See Hohri v. United States,* 586 F.Supp. 769, 792 (D.D.C.1984) (finding that there was no fiduciary obligation towards Japanese–Americans held in internment camps during World War II), *aff'd Hohri v. United States,* 782 F.2d 227, 244 (D.C.Cir. 1986) (concluding that outside the context of Indian tribes, the United States assumes fiduciary obligations only where such intent is explicitly stated).

wages was being withheld. Plaintiffs knew that money was withheld and that it was never refunded. That is, the braceros knew the facts underlying their injury and its cause. *See Alvarez–Machain,* 107 F.3d at 700. This knowledge is all that is required for the statute of limitations to begin to run. Given this knowledge, it is of no consequence that plaintiffs may not have fully understood their legal rights or the available legal remedies, even if such ignorance was the result of unsophistication or illiteracy. *See Barrow v. New Orleans Steamship Ass'n,* 932 F.2d 473, 478 (5th Cir.1991).

### C. Conclusion

Based on the foregoing, the United States motion to dismiss the breach of fiduciary duty claim is hereby GRANTED. The motion to dismiss with respect to all other claims is hereby GRANTED with leave to amend so that plaintiffs may be given the opportunity to plead facts which, if shown, would entitle them to equitable tolling of the statute of limitations.

### CONCLUSION

The Court does not doubt that many braceros never received Savings Fund withholdings to which they were entitled. The Court is sympathetic to the braceros situation. However, just as a court's power to correct injustice is derived from the law, a court's power is circumscribed by the law as well. The plaintiffs are not entitled to any relief from the Mexican Defendants or Wells Fargo in a United States court of law. As currently pled, plaintiffs are not entitled to relief from the United States because their claims are time-barred.

The motions to dismiss of the Mexican Defendants and Wells Fargo are hereby GRANTED. The United States' motion to dismiss is hereby GRANTED without leave to amend with respect to the claim for breach of fiduciary; the motion is

GRANTED with leave to amend with regard to all other claims.

**IT IS SO ORDERED.**